# GRANFINANCIERA, S. A., ET AL. v. NORDBERG, CREDITOR TRUSTEE FOR THE ESTATE OF CHASE & SANBORN CORP., FKA, GENERAL COFFEE CORP.

No. 87–1716.   Argued January 9, 1989—Decided June 23, 1989

34

BRENNAN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and MARSHALL, STEVENS, and KENNEDY, JJ., joined, and in Parts I, II, III, and V, of which SCALIA, J., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 65. WHITE, J., filed a dissenting opinion, *post*, p. 71. BLACKMUN, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 91.

*Adam Lawrence* argued the cause for petitioners. With him on the briefs was *Boyce F. Ezell III.*

*Laurence H. Tribe* argued the cause for respondent. With him on the brief were *Gary Jones* and *Saturnino E. Lucio II.*

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented is whether a person who has not submitted a claim against a bankruptcy estate has a right to a jury trial when sued by the trustee in bankruptcy to recover an allegedly fraudulent monetary transfer. We hold that the Seventh Amendment entitles such a person to a trial by jury, notwithstanding Congress' designation of fraudulent conveyance actions as "core proceedings" in 28 U. S. C. § 157(b)(2)(H) (1982 ed., Supp. V).

I

The Chase & Sanborn Corporation filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in 1983. A plan of reorganization approved by the United States Bankruptcy Court for the Southern District of Florida vested in respondent Nordberg, the trustee in bankruptcy, causes of action for fraudulent conveyances. App. to Pet. for Cert. 37. In 1985, respondent filed suit against petitioners Granfinanciera, S. A., and Medex, Ltda., in the United States District Court for the Southern District of Florida. The complaint alleged that petitioners had received $1.7 million from Chase & Sanborn's corporate predecessor within one year of the date its bankruptcy petition was filed, without receiving consideration or reasonably equivalent value in return. *Id.*, at 39–40. Respondent sought to avoid what he alleged were constructively and actually fraudulent transfers and to recover damages, costs, expenses, and interest under 11 U. S. C. §§ 548(a)(1) and (a)(2), 550(a)(1) (1982 ed. and Supp. V). App. to Pet. for Cert. 41.

The District Court referred the proceedings to the Bankruptcy Court. Over five months later, and shortly before the Colombian Government nationalized Granfinanciera, respond-

ent served a summons on petitioners in Bogota, Colombia. In their answer to the complaint following Granfinanciera's nationalization, both petitioners requested a "trial by jury on all issues so triable." App. 7. The Bankruptcy Judge denied petitioners' request for a jury trial, deeming a suit to recover a fraudulent transfer "a core action that originally, under the English common law, as I understand it, was a non-jury issue." App. to Pet. for Cert. 34. Following a bench trial, the court dismissed with prejudice respondent's actual fraud claim but entered judgment for respondent on the constructive fraud claim in the amount of $1,500,000 against Granfinanciera and $180,000 against Medex. *Id.*, at 24–30. The District Court affirmed without discussing petitioners' claim that they were entitled to a jury trial. *Id.*, at 18–23.

The Court of Appeals for the Eleventh Circuit also affirmed. 835 F. 2d 1341 (1988). The court found that petitioners lacked a statutory right to a jury trial, because the constructive fraud provision under which suit was brought— 11 U. S. C. § 548(a)(2) (1982 ed., Supp. V)—contains no mention of a right to a jury trial, and 28 U. S. C. § 1411 (1982 ed., Supp. V) "affords jury trials only in personal injury or wrongful death suits." 835 F. 2d, at 1348. The Court of Appeals further ruled that the Seventh Amendment supplied no right to a jury trial, because actions to recover fraudulent conveyances are equitable in nature, even when a plaintiff seeks only monetary relief, *id.*, at 1348–1349, and because "bankruptcy itself is equitable in nature and thus bankruptcy proceedings are inherently equitable." *Id.*, at 1349. The court read our opinion in *Katchen* v. *Landy*, 382 U. S. 323 (1966), to say that "Congress may convert a creditor's legal right into an equitable claim and displace any seventh amendment right to trial by jury," and held that Congress had done so by designating fraudulent conveyance actions "core proceedings" triable by bankruptcy judges sitting without juries. 835 F. 2d, at 1349.

We granted certiorari to decide whether petitioners were entitled to a jury trial, 486 U. S. 1054 (1988), and now reverse.

## II

Before considering petitioners' claim to a jury trial, we must confront a preliminary argument. Respondent contends that the judgment below should be affirmed with respect to Granfinanciera—though not Medex—because Granfinanciera was a commercial instrumentality of the Colombian Government when it made its request for a jury trial. Respondent argues that the Seventh Amendment preserves only those jury trial rights recognized in England at common law in the late 18th century, and that foreign sovereigns and their instrumentalities were immune from suit at common law. Suits against foreign sovereigns are only possible, respondent asserts, in accordance with the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U. S. C. §§ 1330, 1602–1611, and respondent reads § 1330(a)[1] to prohibit trial by jury of a case against a foreign state. Respondent concludes that Granfinanciera has no right to a jury trial, regardless of the merits of Medex's Seventh Amendment claim.

We decline to address this argument because respondent failed to raise it below and because the question it poses has not been adequately briefed and argued. Without cross-petitioning for certiorari, a prevailing party may, of course, "defend its judgment on any ground properly raised below whether or not that ground was relied upon, rejected, or even considered by the District Court or the Court of Appeals," *Washington* v. *Yakima Indian Nation*, 439 U. S. 463,

---

[1] Section 1330(a) provides:

"The district courts shall have original jurisdiction without regard to amount in controversy of any *nonjury civil action* against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement." (Emphasis added.)

476, n. 20 (1979), provided that an affirmance on the alternative ground would neither expand nor contract the rights of either party established by the judgment below. See, *e. g.*, *Blum* v. *Bacon*, 457 U. S. 132, 137, n. 5 (1982); *United States* v. *New York Telephone Co.*, 434 U. S. 159, 166, n. 8 (1977). Respondent's present defense of the judgment, however, is not one he advanced below.[2] Although "we could consider grounds supporting [the] judgment different from those on which the Court of Appeals rested its decision," "where the ground presented here has not been raised below we exercise this authority 'only in exceptional cases.'" *Heckler* v. *Campbell*, 461 U. S. 458, 468–469, n. 12 (1983), quoting *McGoldrick* v. *Compagnie Generale Transatlantique*, 309 U. S. 430, 434 (1940).

This is not such an exceptional case. Not only do we lack guidance from the District Court or the Court of Appeals on this issue, but difficult questions remain whether a jury trial is available to a foreign state upon request under 28 U. S. C. § 1330 and, if not, under what circumstances a business enterprise that has since become an arm of a foreign state may be entitled to a jury trial. Compare *Gould, Inc.* v. *Pechiney*

---

[2] Indeed, respondent strenuously supported the Court of Appeals' conclusion, which echoed that of the District Court, see App. to Pet. for Cert. 22, that the "FSIA is inapplicable to the case at bar," 835 F. 2d 1341, 1347 (CA11 1988), not only on the court's rationale that "the transfers in question and the suit to recover those transfers occurred before Granfinanciera was nationalized," *ibid.*, but on the more sweeping rationale that Granfinanciera never proved that it was an instrumentality of a foreign state because it had never really been nationalized. See Brief for Appellee in No. 86–5738 (CA11), pp. 21–30; Brief for Appellee in No. 86–1292 (SD Fla.), pp. 32–36. Admittedly, respondent's present position that the FSIA does not confer immunity on Granfinanciera because it was not an instrumentality of a foreign state when the alleged wrongs occurred or when respondent filed suit is not necessarily incompatible with his claim that Granfinanciera cannot qualify for a jury trial under the FSIA because it requested a jury trial after it was nationalized. Respondent has not attempted, however, to reconcile these views and did not make the second claim until he filed his merits brief in this Court.

*Ugine Kuhlmann*, 853 F. 2d 445, 450 (CA6 1988) (jurisdiction under 28 U. S. C. § 1330 determined by party's status when act complained of occurred); *Morgan Guaranty Trust Co. of N. Y.* v. *Republic of Palau*, 639 F. Supp. 706, 712–716 (SDNY 1986) (status at time complaint was filed is decisive for § 1330 jurisdiction), with *Callejo* v. *Bancomer, S. A.*, 764 F. 2d 1101, 1106–1107 (CA5 1985) (FSIA applies even though bank was nationalized after suit was filed); *Wolf* v. *Banco Nacional de Mexico, S. A.*, 739 F. 2d 1458, 1460 (CA9 1984) (same), cert. denied, 469 U. S. 1108 (1985). Moreover, petitioners alleged in their reply brief, without contradiction by respondent at oral argument, that affirmance on the ground that respondent now urges would "unquestionably enlarge the respondent's rights under the circuit court's decision and concomitantly decrease those of the petitioner" by "open[ing] up new areas of discovery in aid of execution" and by allowing respondent, for the first time, to recover any judgment he wins against Granfinanciera from Colombia's central banking institutions and possibly those of other Colombian governmental instrumentalities. Reply Brief for Petitioners 19. Whatever the merits of these claims, their plausibility, coupled with respondent's failure to offer rebuttal, furnishes an additional reason not to consider respondent's novel argument in support of the judgment at this late stage in the litigation. We therefore leave for another day the questions respondent's argument raises under the FSIA.

III

Petitioners rest their claim to a jury trial on the Seventh Amendment alone.[3] The Seventh Amendment provides: "In

---

[3] The current statutory provision for jury trials in bankruptcy proceedings—28 U. S. C. § 1411 (1982 ed., Supp. V), enacted as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984 (1984 Amendments), Pub. L. 98–353, 98 Stat. 333—is notoriously ambiguous. Section 1411(a) provides: "[T]his chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim." Although this sec-

Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." We have consistently interpreted the phrase "Suits at common law" to refer to "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Parsons* v. *Bedford*, 3 Pet. 433, 447 (1830). Although "the thrust of the

---

tion might suggest that jury trials are available only in personal injury and wrongful death actions, that conclusion is debatable. Section 1411(b) provides that "[t]he district court may order the issues arising [in connection with involuntary bankruptcy petitions] to be tried without a jury," suggesting that the court lacks similar discretion to deny jury trials on at least some issues presented in connection with voluntary petitions. The confused legislative history of these provisions has further puzzled commentators. See, *e. g.*, Gibson, Jury Trials in Bankruptcy: Obeying the Commands of Article III and the Seventh Amendment, 72 Minn. L. Rev. 967, 989–996 (1988) (hereinafter Gibson); Note, The Bankruptcy Amendments and Federal Judgeship Act of 1984: The Impact on the Right of Jury Trial in Bankruptcy Court, 16 Tex. Tech. L. Rev. 535, 543–546 (1985). Whatever the proper construction of § 1411, petitioners concede that this section does not entitle them to a jury trial. Section 122(b) of the 1984 Amendments, 98 Stat. 346, bars application of § 1411 to "cases under title 11 of the United States Code that are pending on the date of enactment of this Act or to proceedings arising in or related to such cases," and Chase & Sanborn's petition for reorganization was pending on that date. Nor does § 1411's predecessor—28 U. S. C. § 1480(a), which stated that "this chapter and title 11 do not affect any right to trial by jury, in a case under title 11 or in a proceeding arising under title 11 or arising in or related to a case under title 11, that is provided by any statute in effect on September 30, 1979"—seem to afford petitioners a statutory basis for their claim. As they recognize, § 1480 was apparently repealed by the 1984 Amendments. See Gibson 989, and n. 96; King, Jurisdiction and Procedure Under the Bankruptcy Amendments of 1984, 38 Vand. L. Rev. 675, 703, and n. 79 (1985); Brief for Respondent 5, n. 11. Petitioners therefore appear correct in concluding that, "absent any specific legislation in force providing jury trials for cases filed before July 10, 1984, but tried afterwards, [their] right to jury trial in this proceeding must necessarily be predicated entirely on the Seventh Amendment." Brief for Petitioners 33, n. 7. See also Brief for Respondent 10, and n. 15.

Amendment was to preserve the right to jury trial as it existed in 1791," the Seventh Amendment also applies to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty. *Curtis* v. *Loether*, 415 U. S. 189, 193 (1974).

The form of our analysis is familiar. "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Tull* v. *United States*, 481 U. S. 412, 417–418 (1987) (citations omitted). The second stage of this analysis is more important than the first. *Id.*, at 421. If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as factfinder.[4]

---

[4] This quite distinct inquiry into whether Congress has permissibly entrusted the resolution of certain disputes to an administrative agency or specialized court of equity, and whether jury trials would impair the functioning of the legislative scheme, appears to be what the Court contemplated when, in *Ross* v. *Bernhard*, 396 U. S. 531, 538, n. 10 (1970), it identified "the practical abilities and limitations of juries" as an additional factor to be consulted in determining whether the Seventh Amendment confers a jury trial right. See *Tull* v. *United States*, 481 U. S., at 418, n. 4; *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442, 454–455 (1977). We consider this issue in Part IV, *infra*. Contrary to JUSTICE WHITE's contention, see *post*, at 79–80, we do not declare that the Seventh Amendment provides a right to a jury trial on all legal rather than equitable claims. If a claim that is legal in nature asserts a "public right," as we define that term in Part IV, then the Seventh Amendment does not entitle the parties to a jury trial if Congress assigns its adjudication to an administrative agency or specialized court of equity. See *infra*, at 51–53. The Seventh Amendment protects a litigant's right to a jury trial only if a cause of action is legal in nature and it involves a matter of "private right."

## A

There is no dispute that actions to recover preferential or fraudulent transfers were often brought at law in late 18th-century England. As we noted in *Schoenthal* v. *Irving Trust Co.*, 287 U. S. 92, 94 (1932) (footnote omitted): "In England, long prior to the enactment of our first Judiciary Act, common law actions of trover and money had and received were resorted to for the recovery of preferential payments by bankrupts." See, *e. g.*, *Smith* v. *Payne*, 6 T. R. 152, 101 Eng. Rep. 484 (K. B. 1795) (trover); *Barnes* v. *Freeland*, 6 T. R. 80, 101 Eng. Rep. 447 (K. B. 1794) (trover); *Smith* v. *Hodson*, 4 T. R. 211, 100 Eng. Rep. 979 (K. B. 1791) (assumpsit; goods sold and delivered); *Vernon* v. *Hanson*, 2 T. R. 287, 100 Eng. Rep. 156 (K. B. 1788) (assumpsit; money had and received); *Thompson* v. *Freeman*, 1 T. R. 155, 99 Eng. Rep. 1026 (K. B. 1786) (trover); *Rust* v. *Cooper*, 2 Cowp. 629, 98 Eng. Rep. 1277 (K. B. 1777) (trover); *Harman* v. *Fishar*, 1 Cowp. 117, 98 Eng. Rep. 998 (K. B. 1774) (trover); *Martin* v. *Pewtress*, 4 Burr. 2477, 98 Eng. Rep. 299 (K. B. 1769) (trover); *Alderson* v. *Temple*, 4 Burr. 2235, 98 Eng. Rep. 165 (K. B. 1768) (trover). These actions, like all suits at law, were conducted before juries.

Respondent does not challenge this proposition or even contend that actions to recover fraudulent conveyances or preferential transfers were more than occasionally tried in courts of equity. He asserts only that courts of equity had concurrent jurisdiction with courts of law over fraudulent conveyance actions. Brief for Respondent 37–38. While respondent's assertion that courts of equity sometimes provided relief in fraudulent conveyance actions is true, however, it hardly suffices to undermine petitioners' submission that the present action for *monetary* relief would not have sounded in equity 200 years ago in England. In *Parsons* v. *Bedford, supra*, at 447 (emphasis added), we contrasted suits at law with "those where equitable rights *alone* were recognized" in holding that the Seventh Amendment right to a jury

trial applies to all but the latter actions. Respondent adduces no authority to buttress the claim that suits to recover an allegedly fraudulent transfer of money, of the sort that he has brought, were typically or indeed ever entertained by English courts of equity when the Seventh Amendment was adopted. In fact, prior decisions of this Court, see, *e. g.*, *Buzard* v. *Houston*, 119 U. S. 347, 352–353 (1886), and scholarly authority compel the contrary conclusion:

> "[W]hether the trustee's suit should be at law or in equity is to be judged by the same standards that are applied to any other owner of property which is wrongfully withheld. If the subject matter is a chattel, and is still in the grantee's possession, an action in trover or replevin would be the trustee's remedy; and if the fraudulent transfer was of cash, the trustee's action would be for money had and received. Such actions at law are as available to the trustee to-day as they were in the English courts of long ago. If, on the other hand, the subject matter is land or an intangible, or the trustee needs equitable aid for an accounting or the like, he may invoke the equitable process, and that also is beyond dispute." 1 G. Glenn, Fraudulent Conveyances and Preferences § 98, pp. 183–184 (rev. ed. 1940) (footnotes omitted).

The two cases respondent discusses confirm this account of English practice. *Ex parte Scudamore*, 3 Ves. jun. 85, 30 Eng. Rep. 907 (Ch. 1796), involved the debtor's assignment of his share of a law partnership's receivables to repay a debt shortly before the debtor was declared bankrupt. Other creditors petitioned chancery for an order directing the debtor's law partner to hand over for general distribution among creditors the debtor's current and future shares of the partnership's receivables, which he held in trust for the assignee. The Chancellor refused to do so, finding the proposal inequitable. Instead, he directed the creditors to bring an action at law against the assignee if they thought themselves enti-

tled to relief. Although this case demonstrates that fraudulent conveyance actions could be brought in equity, it does not show that suits to recover a definite sum of money would be decided by a court of equity when a petitioner did not seek distinctively equitable remedies. The creditors in *Ex parte Scudamore* asked the Chancellor to provide injunctive relief by ordering the debtor's former law partner to convey to them the debtor's share of the partnership's receivables that came into his possession in the future, along with receivables he then held in trust for the debtor. To the extent that they asked the court to order relinquishment of a specific preferential transfer rather than ongoing equitable relief, the Chancellor dismissed their suit and noted that the proper means of recovery would be an action at law against the transferee. Respondent's own cause of action is of precisely that sort.

*Hobbs* v. *Hull*, 1 Cox 445, 29 Eng. Rep. 1242 (Ch. 1788), also fails to advance respondent's case. The assignees in bankruptcy there sued to set aside an alleged fraudulent conveyance of real estate in trust by a husband to his wife, in return for her relinquishment of a cause of action in divorce upon discovering his adultery. The court dismissed the suit, finding that the transfer was not fraudulent, and allowed the assignees to bring an ejectment or other legal action in the law courts. The salient point is that the bankruptcy assignees sought the traditional equitable remedy of setting aside a conveyance of land in trust, rather than the recovery of money or goods, and that the court refused to decide their legal claim to ejectment once it had ruled that no equitable remedy would lie. The court's sweeping statement that "Courts of Equity have most certainly been in the habit of exercising a concurrent jurisdiction with the Courts of Law on the statutes of *Elizabeth* respecting fraudulent conveyances," *id.*, at 445–446, 30 Eng. Rep., at 1242, is not supported by reference to any cases that sought the recovery of a fixed sum of money without the need for an accounting or

46

other equitable relief. Nor has respondent repaired this deficit.[5] We therefore conclude that respondent would have had to bring his action to recover an alleged fraudulent con-

---

[5] Rather than list 18th-century English cases to support the contention that fraudulent monetary transfers were traditionally cognizable in equity, respondent cites three recent cases from the Courts of Appeals. These cases, however, weaken rather than bolster respondent's argument. *In re Graham*, 747 F. 2d 1383 (CA11 1984), held that there was no Seventh Amendment jury trial right in a suit for the *equitable* remedy of setting aside an alleged fraudulent conveyance of *real estate* by a bankrupt. With respect to suits like respondent's, the court expressly noted that "an action by a creditor or trustee-in-bankruptcy seeking money damages is an action at law." *Id.*, at 1387 (citations omitted). *Damsky* v. *Zavatt*, 289 F. 2d 46 (CA2 1961), also involved a conveyance of real estate. And there, too, the court acknowledged that jury trials are ordinarily available with respect to monetary claims. See *id.*, at 54.

Both of these holdings are questionable, moreover, to the extent that they are in tension with our decision in *Whitehead* v. *Shattuck*, 138 U. S. 146 (1891). Although there is scholarly support for the claim that actions to recover real property are quintessentially equitable actions, see 1 G. Glenn, Fraudulent Conveyances and Preferences § 98, pp. 183–184 (rev. ed. 1940), in *Whitehead* we stated:

"[W]here an action is simply for the recovery and possession of specific real or personal property, or for the recovery of a money judgment, the action is one at law. An action for the recovery of real property, including damages for withholding it, has always been of that class. The right which in this case the plaintiff wishes to assert is his title to certain real property; the remedy which he wishes to obtain is its possession and enjoyment; and in a contest over the title both parties have a constitutional right to call for a jury." 138 U. S., at 151.

See also *Pernell* v. *Southall Realty*, 416 U. S. 363, 370–374 (1974).

Finally, respondent misreads *In re Harbour*, 840 F. 2d 1165, 1172–1173 (1988). The Fourth Circuit relied in that case on the same authorities to which we have referred, distinguishing between suits to recover fraudulent transfers and other bankruptcy proceedings. The court's holding that the Seventh Amendment right to a jury trial no longer extends to such actions was based not on its historical analysis, which accords with our own, but on its erroneous belief that Congress possesses the power to assign jurisdiction over all fraudulent conveyance actions to bankruptcy courts sitting without juries. The case therefore lends no support to respondent's historical argument.

veyance of a determinate sum of money at law in 18th-century England, and that a court of equity would not have adjudicated it.[6]

## B

The nature of the relief respondent seeks strongly supports our preliminary finding that the right he invokes should be denominated legal rather than equitable. Our decisions establish beyond peradventure that "[i]n cases of fraud or mistake, as under any other head of chancery jurisdiction, a court of the United States will not sustain a bill in equity to obtain only a decree for the payment of money by way of

---

[6] Citing several authorities, JUSTICE WHITE contends that "[o]ther scholars have looked at the same history and come to a different conclusion." *Post*, at 85, and n. 7. This assertion, however, lacks the support it claims. With the exception of Justice Gray's opinion in *Drake* v. *Rice*, 130 Mass. 410, 412 (1881), and Roberts' treatise, none of the authorities cited so much as mentions 18th-century English practice. Although Collier offers as its opinion that actions to set aside fraudulent transfers are equitable in nature, 4 Collier on Bankruptcy ¶ 548.10, p. 548–125 (15th ed. 1989), it refers only to recent cases in defending its opinion, while acknowledging that some courts have disagreed. Bump and Wait both limit their citations to state-court decisions, refusing to analyze earlier English cases. See O. Bump, Conveyances Made by Debtors to Defraud Creditors § 532 (4th ed. 1896); F. Wait, Fraudulent Conveyances and Creditors' Bills §§ 56–60 (1884). To be sure, in *Drake* v. *Rice*, 130 Mass., at 412, Justice Gray says that, "[b]y the law of England before the American Revolution, . . . fraudulent conveyances of choses in action, though not specified in the statute [of Elizabeth], were equally void, but from the nature of the subject the remedy of the creditor must be sought in equity." But the reason why suits to recover fraudulent transfers of choses in action had to be brought in equity, Justice Gray points out, is that they could not be attached or levied upon. *Id.*, at 413. See also O. Bump, *supra*, § 531 ("[T]here is no remedy at law when the property can not be taken on execution or by attachment"). Justice Gray's summary of 18th-century English practice does not extend to cases, such as those involving monetary transfers, where an adequate remedy existed at law. The passage JUSTICE WHITE cites from Roberts' treatise is obscure, and does not speak squarely to the question whether 18th-century English courts of equity would hear cases where legal remedies were sufficient. See W. Roberts, Voluntary and Fraudulent Conveyances 526–527 (3d Am. ed. 1845).

damages, when the like amount can be recovered at law in an action sounding in tort or for money had and received." *Buzard* v. *Houston,* 119 U. S., at 352, citing *Parkersburg* v. *Brown,* 106 U. S. 487, 500 (1883); *Ambler* v. *Choteau,* 107 U. S. 586 (1883); *Litchfield* v. *Ballou,* 114 U. S. 190 (1885). See also *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n,* 430 U. S. 442, 454, n. 11 (1977) ("the otherwise legal issues of voidable preferences"); *Pernell* v. *Southall Realty,* 416 U. S. 363, 370 (1974) ("'[W]here an action is simply for the recovery . . . of a money judgment, the action is one at law'"), quoting *Whitehead* v. *Shattuck,* 138 U. S. 146, 151 (1891); *Dairy Queen, Inc.* v. *Wood,* 369 U. S. 469, 476 (1962) ("Petitioner's contention . . . is that insofar as the complaint requests a money judgment it presents a claim which is unquestionably legal.  We agree with that contention"); *Gaines* v. *Miller,* 111 U. S. 395, 397–398 (1884) ("Whenever one person has in his hands money equitably belonging to another, that other person may recover it by assumpsit for money had and received.  The remedy at law is adequate and complete") (citations omitted).

Indeed, in our view *Schoenthal* v. *Irving Trust Co.,* 287 U. S. 92 (1932), removes all doubt that respondent's cause of action should be characterized as legal rather than as equitable.  In *Schoenthal,* the trustee in bankruptcy sued in equity to recover alleged preferential payments, claiming that it had no adequate remedy at law.  As in this case, the recipients of the payments apparently did not file claims against the bankruptcy estate.  The Court held that the suit had to proceed at law instead, because the long-settled rule that suits in equity will not be sustained where a complete remedy exists at law, then codified at 28 U. S. C. §384, "serves to guard the right of trial by jury preserved by the Seventh Amendment and to that end it should be liberally construed."  287 U. S., at 94.  The Court found that the trustee's suit—indistinguishable from respondent's suit in all relevant respects— could not go forward in equity because an adequate remedy

was available at law. There, as here, "[t]he preferences sued for were money payments of ascertained and definite amounts," and "[t]he bill discloses no facts that call for an accounting or other equitable relief." *Id.*, at 95. Respondent's fraudulent conveyance action plainly seeks relief traditionally provided by law courts or on the law side of courts having both legal and equitable dockets.[7] Unless Congress may and has permissibly withdrawn jurisdiction over that action by courts of law and assigned it exclusively to non-Article III tribunals sitting without juries, the Seventh Amendment guarantees petitioners a jury trial upon request.

## IV

Prior to passage of the Bankruptcy Reform Act of 1978, Pub. L. 95–598, 92 Stat. 2549 (1978 Act), "[s]uits to recover preferences constitute[d] no part of the proceedings in bank-

---

[7] Respondent claims to seek "avoidance" of the allegedly fraudulent transfers and restitution of the funds that were actually transferred, but maintains that petitioners have made restitution impossible because the transferred funds cannot be distinguished from the other dollars in petitioners' bank accounts. See Brief for Respondent 39–44. Because avoidance and restitution are classical equitable remedies, he says, petitioners are not entitled to a trial by jury. We find this strained attempt to circumvent precedent unpersuasive. Because dollars are fungible, and respondent has not requested an accounting or other specifically equitable form of relief, a complete remedy is available at law, and equity will not countenance an action when complete relief may be obtained at law. See, *e. g.*, *Schoenthal* v. *Irving Trust Co.*, 287 U. S., at 94–95. Moreover, because a plaintiff is entitled to return of any funds transferred in violation of 11 U. S. C. § 548 (1982 ed., Supp. V), and because a judge lacks equitable discretion to refuse to enter an award for less than the amount of the transfer, any distinction that might exist between "damages" and monetary relief under a different label is purely semantic, with no relevance to the adjudication of petitioners' Seventh Amendment claim. Cf. *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 442–443 (1975) (REHNQUIST, J., concurring). Indeed, even if the checks respondent seeks to recover lay untouched in petitioners' offices, legal remedies would apparently have sufficed. See, *e. g.*, *Adams* v. *Champion*, 294 U. S. 231, 234 (1935); *Whitehead* v. *Shattuck*, 138 U. S., at 151.

ruptcy." *Schoenthal* v. *Irving Trust Co., supra,* at 94–95. Although related to bankruptcy proceedings, fraudulent conveyance and preference actions brought by a trustee in bankruptcy were deemed separate, plenary suits to which the Seventh Amendment applied. While the 1978 Act brought those actions within the jurisdiction of the bankruptcy courts, it preserved parties' rights to trial by jury as they existed prior to the effective date of the 1978 Act. 28 U. S. C. § 1480(a) (repealed). The 1984 Amendments, however, designated fraudulent conveyance actions "core proceedings," 28 U. S. C. § 157(b)(2)(H) (1982 ed., Supp. V), which bankruptcy judges may adjudicate and in which they may issue final judgments, § 157(b)(1), if a district court has referred the matter to them, § 157(a). We are not obliged to decide today whether bankruptcy courts may conduct jury trials in fraudulent conveyance suits brought by a trustee against a person who has not entered a claim against the estate, either in the rare procedural posture of this case, see *supra,* at 41, n. 3, or under the current statutory scheme, see 28 U. S. C. § 1411 (1982 ed., Supp. V). Nor need we decide whether, if Congress has authorized bankruptcy courts to hold jury trials in such actions, that authorization comports with Article III when non-Article III judges preside over the actions subject to review in, or withdrawal by, the district courts. We also need not consider whether jury trials conducted by a bankruptcy court would satisfy the Seventh Amendment's command that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law," given that district courts may presently set aside clearly erroneous factual findings by bankruptcy courts. Bkrtcy. Rule 8013. The sole issue before us is whether the Seventh Amendment confers on petitioners a right to a jury trial in the face of Congress' decision to allow a non-Article III tribunal to adjudicate the claims against them.

## A

In *Atlas Roofing*, we noted that "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.'" 430 U. S., at 455 (footnote omitted). We emphasized, however, that Congress' power to block application of the Seventh Amendment to a cause of action has limits. Congress may only deny trials by jury in actions at law, we said, in cases where "public rights" are litigated: "Our prior cases support administrative factfinding in only those situations involving 'public rights,' *e. g.*, where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights. Wholly private tort, contract, and property cases, as well as a vast range of other cases, are not at all implicated." *Id.*, at 458.[8]

We adhere to that general teaching. As we said in *Atlas Roofing:* "'On the common law side of the federal courts, the aid of juries is not only deemed appropriate but is required by the Constitution itself.'" *Id.*, at 450, n. 7, quoting *Crowell* v. *Benson*, 285 U. S. 22, 51 (1932). Congress may devise novel causes of action involving public rights free from the strictures of the Seventh Amendment if it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders.[9] But it lacks the power to strip parties

---

[8] Although we left the term "public rights" undefined in *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S., at 450, 458, we cited *Crowell* v. *Benson*, 285 U. S. 22 (1932), approvingly. In *Crowell*, we defined "private right" as "the liability of one individual to another under the law as defined," *id.*, at 51, in contrast to cases that "arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Id.*, at 50.

[9] This proposition was firmly established in *Atlas Roofing, supra*, at 455 (footnote omitted):

contesting matters of private right of their constitutional right to a trial by jury. As we recognized in *Atlas Roofing*, to hold otherwise would be to permit Congress to eviscerate the Seventh Amendment's guarantee by assigning to administrative agencies or courts of equity all causes of action not grounded in state law, whether they originate in a newly fashioned regulatory scheme or possess a long line of common-law forebears. 430 U. S., at 457–458. The Constitution nowhere grants Congress such puissant authority. "[L]egal claims are not magically converted into equitable issues by their presentation to a court of equity," *Ross* v. *Bernhard*, 396 U. S. 531, 538 (1970), nor can Congress conjure away the Seventh Amendment by mandating that traditional legal claims be brought there or taken to an administrative tribunal.

In certain situations, of course, Congress may fashion causes of action that are closely *analogous* to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable. See, *e. g.*, *Atlas Roofing*, *supra*, at 450–461 (workplace safety regulations); *Block* v. *Hirsh*, 256 U. S. 135, 158 (1921) (temporary emergency regulation of rental real estate). See also *Pernell* v. *Southall Realty*, 416 U. S., at 382–383 (discussing cases); *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856) (Congress "may or may not bring within the cognizance of the courts of the United States, as it may deem proper," matters involving public rights). Congress' power to do so is limited, however, just as its power to place adjudicative authority in non-Article III tribunals is circumscribed. See *Thomas* v.

---

"Congress is not required by the Seventh Amendment to choke the already crowded federal courts with new types of litigation or prevented from committing some new types of litigation to administrative agencies with special competence in the relevant field. This is the case even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned to a federal court of law instead of an administrative agency."

*Union Carbide Agricultural Products Co.*, 473 U. S. 568, 589, 593–594 (1985); *id.*, at 598–600 (BRENNAN, J., concurring in judgment); *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 73–76 (1982) (opinion of BRENNAN, J.); *id.*, at 91 (REHNQUIST, J., concurring in judgment). Unless a legal cause of action involves "public rights," Congress may not deprive parties litigating over such a right of the Seventh Amendment's guarantee to a jury trial.

In *Atlas Roofing, supra,* at 458, we noted that Congress may effectively supplant a common-law cause of action carrying with it a right to a jury trial with a statutory cause of action shorn of a jury trial right if that statutory cause of action inheres in, or lies against, the Federal Government in its sovereign capacity. Our case law makes plain, however, that the class of "public rights" whose adjudication Congress may assign to administrative agencies or courts of equity sitting without juries is more expansive than *Atlas Roofing*'s discussion suggests. Indeed, our decisions point to the conclusion that, if a statutory cause of action is legal in nature, the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal. For if a statutory cause of action, such as respondent's right to recover a fraudulent conveyance under 11 U. S. C. § 548(a)(2), is not a "public right" for Article III purposes, then Congress may not assign its adjudication to a specialized non-Article III court lacking "the essential attributes of the judicial power." *Crowell* v. *Benson, supra,* at 51. And if the action must be tried under the auspices of an Article III court, then the Seventh Amendment affords the parties a right to a jury trial whenever the cause of action is legal in nature. Conversely, if Congress may assign the adjudication of a statutory cause of action to a non-Article III tribunal, then the

Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder. See, *e. g.,* *Atlas Roofing, supra,* at 453–455, 460; *Pernell* v. *Southall Realty, supra,* at 383; *Block* v. *Hirsh, supra,* at 158. In addition to our Seventh Amendment precedents, we therefore rely on our decisions exploring the restrictions Article III places on Congress' choice of adjudicative bodies to resolve disputes over statutory rights to determine whether petitioners are entitled to a jury trial.

In our most recent discussion of the "public rights" doctrine as it bears on Congress' power to commit adjudication of a statutory cause of action to a non-Article III tribunal, we rejected the view that "a matter of public rights must at a minimum arise 'between the government and others.'" *Northern Pipeline Construction Co., supra,* at 69 (opinion of BRENNAN, J.), quoting *Ex parte Bakelite Corp.,* 279 U. S. 438, 451 (1929). We held, instead, that the Federal Government need not be a party for a case to revolve around "public rights." *Thomas* v. *Union Carbide Agricultural Products Co.,* 473 U. S., at 586; *id.,* at 596–599 (BRENNAN, J., concurring in judgment). The crucial question, in cases not involving the Federal Government, is whether "Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, [has] create[d] a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Id.,* at 593–594. See *id.,* at 600 (BRENNAN, J., concurring in judgment) (challenged provision involves public rights because "the dispute arises in the context of a federal regulatory scheme that virtually occupies the field"). If a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government,

then it must be adjudicated by an Article III court.[10]   If the right is legal in nature, then it carries with it the Seventh Amendment's guarantee of a jury trial.

## B

Although the issue admits of some debate, a bankruptcy trustee's right to recover a fraudulent conveyance under 11 U. S. C. § 548(a)(2) seems to us more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions.   In *Northern Pipeline Construction Co.*, 458 U. S., at 71, the plurality noted

---

[10] In *Atlas Roofing*, 430 U. S., at 442, 450, n. 7, we stated that "[i]n cases which do involve only 'private rights,' this Court has accepted factfinding by an administrative agency, without intervention by a jury, only as an adjunct to an Art. III court, analogizing the agency to a jury or a special master and permitting it in admiralty cases to perform the function of the special master."   That statement, however, must be read in context.   First, we referred explicitly only to Congress' power, where disputes concern private rights, to provide administrative factfinding instead of jury trials in *admiralty* cases.   Civil causes of action in admiralty, however, are not suits at common law for Seventh Amendment purposes, and thus no constitutional right to a jury trial attaches.   *Waring* v. *Clarke*, 5 How. 441, 460 (1847).   Second, our statement should not be taken to mean that Congress may assign at least the initial factfinding in all cases involving controversies entirely between private parties to administrative agencies or other tribunals not involving juries, so long as they are established as adjuncts to Article III courts.   If that were so, Congress could render the Seventh Amendment a nullity.   Rather, that statement, citing *Crowell* v. *Benson*, 285 U. S., at 51–65, means only that in *some* cases involving "private rights" *as that term was defined in* Crowell *and used in* Atlas Roofing—namely, as encompassing all disputes to which the Federal Government is not a party in its sovereign capacity—may Congress dispense with juries as factfinders through its choice of an adjudicative forum. Those cases in which Congress may decline to provide jury trials are ones involving statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to an administrative agency or specialized court of equity.   Whatever terminological distinctions *Atlas Roofing* may have suggested, we now refer to those rights as "public" rather than "private."

that the restructuring of debtor-creditor relations in bankruptcy "may well be a 'public right.'"[11] But the plurality also emphasized that state-law causes of action for breach of contract or warranty are paradigmatic private rights, even when asserted by an insolvent corporation in the midst of Chapter 11 reorganization proceedings. The plurality further said that "matters from their nature subject to 'a suit at common law or in equity or admiralty'" lie at the "protected core" of Article III judicial power, *id.*, at 71, n. 25; see *id.*, at 90 (REHNQUIST, J., concurring in judgment)—a point we reaffirmed in *Thomas, supra,* at 587. There can be little doubt that fraudulent conveyance actions by bankruptcy trustees — suits which, we said in *Schoenthal* v. *Irving Trust Co.*, 287 U. S., at 94–95 (citation omitted), "constitute no part of the proceedings in bankruptcy but concern controversies arising out of it"—are quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res. See Gibson 1022–1025. They therefore appear matters of private rather than public right.[12]

---

[11] We do not suggest that the restructuring of debtor-creditor relations is in fact a public right. This thesis has met with substantial scholarly criticism, see, e. g., Gibson 1041, n. 347; Currie, Bankruptcy Judges and the Independent Judiciary, 16 Creighton L. Rev. 441, 452 (1983); Baird, Bankruptcy Procedure and State-Created Rights: The Lessons of Gibbons and Marathon, 1982 Sup. Ct. Rev. 25, 44, and we need not and do not seek to defend it here. Our point is that even if one accepts this thesis, the Seventh Amendment entitles petitioners to a jury trial.

[12] See *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 71 (1982) (opinion of BRENNAN, J.):

"[T]he restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a 'public right,' but the latter obviously is not."

Our decision in *Katchen* v. *Landy*, 382 U. S. 323 (1966), under the Seventh Amendment rather than Article III, confirms this analysis. Petitioner, an officer of a bankrupt corporation, made payments from corporate funds within four months of bankruptcy on corporate notes on which he was an accommodation maker. When petitioner later filed claims against the bankruptcy estate, the trustee counterclaimed, arguing that the payments petitioner made constituted voidable preferences because they reduced his potential personal liability on the notes. We held that the bankruptcy court had jurisdiction to order petitioner to surrender the preferences and that it could rule on the trustee's claim without according petitioner a jury trial. Our holding did not depend, however, on the fact that "[bankruptcy] courts are essentially courts of equity" because "they characteristically proceed in summary fashion to deal with the assets of the bankrupt they are administering." *Id.*, at 327. Notwithstanding the fact that bankruptcy courts "characteristically" supervised summary proceedings, they were statutorily invested with jurisdiction at law as well, and could also oversee plenary proceedings. See *Atlas Roofing*, 430 U. S., at 454, n. 11 (*Katchen* rested "on the ground that a bankruptcy court, *exercising its summary jurisdiction*, was a specialized court of equity") (emphasis added); *Pepper* v. *Litton*, 308 U. S. 295, 304 (1939) ("*[F]or many purposes* 'courts of bankruptcy are essentially courts of equity'") (emphasis added). Our decision turned, rather, on the bankruptcy court's having "actual or constructive possession" of the bankruptcy estate, 382 U. S., at 327, and its power and obligation to consider objections by the trustee in deciding whether to allow claims against the estate. *Id.*, at 329–331. Citing *Schoenthal* v. *Irving Trust Co., supra*, approvingly, we expressly stated that, if petitioner had not submitted a claim to the bankruptcy court, the trustee could have recovered the preference only by a plenary action, and that petitioner would have

been entitled to a jury trial if the trustee had brought a plenary action in federal court. See 382 U. S., at 327–328. We could not have made plainer that our holding in *Schoenthal* retained its vitality: "[A]lthough petitioner might be entitled to a jury trial on the issue of preference if he presented no claim in the bankruptcy proceeding and awaited a federal plenary action by the trustee, *Schoenthal* v. *Irving Trust Co.*, 287 U. S. 92, when the same issue arises as part of the process of allowance and disallowance of claims, it is triable in equity." *Id.*, at 336.[13]

Unlike JUSTICE WHITE, see *post*, at 72–75, 78, we do not view the Court's conclusion in *Katchen* as resting on an accident of statutory history. We read *Schoenthal* and *Katchen* as holding that, under the Seventh Amendment, a creditor's right to a jury trial on a bankruptcy trustee's preference claim depends upon whether the creditor has submitted a claim against the estate, not upon Congress' precise definition of the "bankruptcy estate" or upon whether Congress chanced to deny jury trials to creditors who have not filed claims and who are sued by a trustee to recover an alleged preference. Because petitioners here, like the petitioner in *Schoenthal*, have not filed claims against the estate, respondent's fraudulent conveyance action does not arise "as part of the process of allowance and disallowance of claims." Nor is that action integral to the restructuring of debtor-creditor relations. Congress therefore cannot divest petitioners of

---

[13] Although we said in *Katchen* v. *Landy*, 382 U. S., at 336, that the petitioner *might* have been entitled to a jury trial had he presented no claim against the bankruptcy estate, our approving references not only to *Schoenthal* but also to *Adams* v. *Champion*, 294 U. S., at 234, and *Buffum* v. *Barceloux Co.*, 289 U. S. 227, 235–236 (1933), see 382 U. S., at 327–328, demonstrate that we did not intend to cast doubt on the proposition that the petitioner in *Katchen* would have been entitled to a jury trial had he not entered a claim against the estate and had the bankruptcy trustee requested solely legal relief. We merely left open the possibility that a jury trial might not be required because in some cases preference avoidance actions are equitable in character.

their Seventh Amendment right to a trial by jury. *Katchen* thus supports the result we reach today; it certainly does not compel its opposite.[14]

---

[14] In *Katchen, supra,* at 335, we adopted a rationale articulated in *Alexander* v. *Hillman,* 296 U. S. 222, 241–242 (1935) (citations omitted):

"'By presenting their claims respondents subjected themselves to all the consequences that attach to an appearance . . . .

"'Respondents' contention means that, while invoking the court's jurisdiction to establish their right to participate in the distribution, they may deny its power to require them to account for what they misappropriated. In behalf of creditors and stockholders, the receivers reasonably may insist that, before taking aught, respondents may by the receivership court be required to make restitution. That requirement is in harmony with the rule generally followed by courts of equity that having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and decree complete relief.'"

It warrants emphasis that this rationale differs from the notion of waiver on which the Court relied in *Commodity Futures Trading Comm'n* v. *Schor,* 478 U. S. 833 (1986). The Court ruled in *Schor*—where no Seventh Amendment claims were presented—that the Commodities Futures Trading Commission could adjudicate state-law counterclaims to a federal action by investors against their broker consistent with Article III. The Court reached this conclusion, however, not on the ground that the Commission had possession of a disputed res, to which the investors laid claim, but on the ground that Congress did not require investors to avail themselves of the remedial scheme over which the Commission presided. The investors could have pursued their claims, albeit less expeditiously, in federal court. By electing to use the speedier, alternative procedures Congress had created, the Court said, the investors waived their right to have the state-law counterclaims against them adjudicated by an Article III court. See *id.,* at 847–850. Parallel reasoning is unavailable in the context of bankruptcy proceedings, because creditors lack an alternative forum to the bankruptcy court in which to pursue their claims. As *Katchen* makes clear, however, by submitting a claim against the bankruptcy estate, creditors subject themselves to the court's equitable power to disallow those claims, even though the debtor's opposing counterclaims are legal in nature and the Seventh Amendment would have entitled creditors to a jury trial had they not tendered claims against the estate.

It hardly needs pointing out that JUSTICE WHITE's assertion, see *post,* at 71–72, that this case is controlled by the Court's statement in *Katchen* that

The 1978 Act abolished the statutory distinction between plenary and summary bankruptcy proceedings, on which the Court relied in *Schoenthal* and *Katchen*. Although the 1978 Act preserved parties' rights to jury trials as they existed prior to the day it took effect, 28 U. S. C. § 1480(a) (repealed), in the 1984 Amendments Congress drew a new distinction between "core" and "non-core" proceedings and classified fraudulent conveyance actions as core proceedings triable by bankruptcy judges. 28 U. S. C. § 157(b)(2)(H) (1982 ed., Supp. V). Whether 28 U. S. C. § 1411 (1982 ed., Supp. V) purports to abolish jury trial rights in what were formerly plenary actions is unclear, and at any rate is not a question we need decide here. See *supra*, at 40–41, n. 3. The decisive point is that in neither the 1978 Act nor the 1984 Amendments did Congress "creat[e] a new cause of action, and remedies therefor, unknown to the common law," because traditional rights and remedies were inadequate to cope with a manifest public problem. *Atlas Roofing*, 430 U. S., at 461. Rather, Congress simply reclassified a pre-existing, common-law cause of action that was not integrally related to the reformation of debtor-creditor relations[15] and

---

"it makes no difference, so far as petitioner's Seventh Amendment claim is concerned, whether the bankruptcy trustee urges only a § 57g objection or also seeks affirmative relief," 382 U. S., at 337–338, is entirely unfounded. Read in context, the Court's statement merely means that once a creditor has filed a claim against the estate, the bankruptcy trustee may recover the full amount of any preference received by the creditor-claimant, even if that amount exceeds the amount of the creditor's claim. The Court's statement says nothing about a creditor's Seventh Amendment right to a jury trial on a trustee's preference action when the creditor has *not* entered a claim against the estate.

[15] The adventitious relation of a trustee's fraudulent conveyance actions to the reorganization proceedings themselves—which we recognized in *Schoenthal* and *Katchen*, which federal bankruptcy legislation acknowledged until 1978 by treating them as plenary actions when the defendant had not made a claim against the estate, and for which Congress expressly provided jury trial rights until 1984—is further evidenced by the events in this case. Respondent's fraudulent conveyance action was not filed until

that apparently did not suffer from any grave deficiencies. This purely taxonomic change cannot alter our Seventh Amendment analysis. Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity. See Gibson 1022–1025.

Nor can Congress' assignment be justified on the ground that jury trials of fraudulent conveyance actions would "go far to dismantle the statutory scheme," *Atlas Roofing*, 430 U. S., at 454, n. 11, or that bankruptcy proceedings have been placed in "an administrative forum with which the jury would be incompatible." *Id.*, at 450. To be sure, we owe some deference to Congress' judgment after it has given careful consideration to the constitutionality of a legislative provision. See *Northern Pipeline Construction Co.*, 458 U. S., at 61 (opinion of BRENNAN, J.). But respondent has adduced no evidence that Congress considered the constitutional implications of its designation of all fraudulent conveyance actions as core proceedings. Nor can it seriously be argued that permitting jury trials in fraudulent conveyance actions brought by a trustee against a person who has not entered a claim against the estate would "go far to dismantle the statutory scheme," as we used that phrase in *Atlas Roofing*, when our opinion in that case, following *Schoenthal*, plainly assumed that such claims carried with them a right to a jury trial.[16] In addition, one cannot easily say that "the

---

well *after* the Bankruptcy Court had approved the plan of reorganization and Chase & Sanborn's tangible assets and business had been liquidated. Reply Brief for Petitioner 9.

[16] Of course, the 1984 Amendments altered the statutory scheme that formed the backdrop to our discussion in *Atlas Roofing*. But in this connection they did so only by depriving persons who have not filed claims against the estate of a statutory right to a jury trial when the trustee sues them to recover an alleged fraudulent conveyance or preferential transfer. The 1984 Amendments did not alter the nature of the trustee's claim or the

jury would be incompatible" with bankruptcy proceedings, in view of Congress' express provision for jury trials in certain actions arising out of bankruptcy litigation. See 28 U. S. C. § 1411 (1982 ed., Supp. V); Gibson 1024–1025; Warner, *Katchen* Up in Bankruptcy: The New Jury Trial Right, 63 Am. Bankr. L. J. 1, 48 (1989) (hereinafter Warner). And JUSTICE WHITE's claim that juries may serve usefully as checks only on the decisions of judges who enjoy life tenure, see

relief to which he was entitled. To say that our failure to respect Congress' reclassification of these causes of action would "go far to dismantle the statutory scheme" simply because they partly define the new statutory scheme would be to render this test an empty tautology.

This is not to say, of course, contrary to JUSTICE WHITE's assertion, see *post*, at 75, n. 4, that we regard Congress' amendments to the bankruptcy statutes as an "act of whimsy." The sweeping changes Congress instituted in 1978 were clearly intended to make the reorganization process more efficient, as JUSTICE WHITE's quotation from a Senate Report indicates. But the radical reforms of 1978, on whose legislative history his dissent relies, did not work the slightest alteration in the right to a jury trial of alleged recipients of fraudulent conveyances. That change came in 1984. Although enhanced efficiency was likely Congress' aim once again, neither JUSTICE WHITE nor JUSTICE BLACKMUN points to any statement from the legislative history of the 1984 Amendments confirming this supposition with respect to preference actions in particular. More important, they offer no evidence that Congress considered the propriety of its action under the Seventh Amendment. The House Report cited by JUSTICE BLACKMUN, see *post*, at 93, advocated conferring Article III status on bankruptcy judges. Its favored approach would therefore have eliminated the problem before us by clearly *entitling* petitioners to a jury trial under the Seventh Amendment. See H. R. Rep. No. 98–9, pt. 1, pp. 7, 9, 16 (1983). This approach was rejected by the Senate. In defending an alternative proposal that ultimately prevailed, however, the Senate Report to which JUSTICE BLACKMUN refers neglects to discuss specifically the inclusion of preference actions in the class of core proceedings or potential difficulties under the Seventh Amendment to which that assignment might give rise. See S. Rep. No. 98–55, pp. 32–40 (1983). Apparently, the Senate Judiciary Committee overlooked this problem entirely. Thus, the 1984 Amendments' denial of the right to a jury trial in preference and fraudulent conveyance actions can hardly be said to represent Congress' considered judgment of the constitutionality of this change.

*post*, at 82–83, overlooks the extent to which judges who are appointed for fixed terms may be beholden to Congress or Executive officials, and thus ignores the potential for juries to exercise beneficial restraint on their decisions.

It may be that providing jury trials in some fraudulent conveyance actions—if not in this particular case, because respondent's suit was commenced after the Bankruptcy Court approved the debtor's plan of reorganization—would impede swift resolution of bankruptcy proceedings and increase the expense of Chapter 11 reorganizations.[17]  But "these considerations are insufficient to overcome the clear command of the Seventh Amendment." *Curtis* v. *Loether*, 415 U. S., at 198.  See also *Bowsher* v. *Synar*, 478 U. S. 714, 736 (1986) ("'[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution'"), quoting *INS* v. *Chadha*, 462 U. S. 919, 944 (1983); *Pernell* v. *Southall Realty*, 416 U. S., at 383–384 (discounting arguments that jury trials would be unduly burdensome and rejecting "the notion that there is some necessary

---

[17] Respondent argues, for example, that the prompt resolution of fraudulent transfer claims brought by bankruptcy trustees is often crucial to the reorganization process and that if, by demanding a jury trial, a party could delay those proceedings, it could alter the negotiating framework and unfairly extract more favorable terms for itself.  Brief for Respondent 35. It warrants notice, however, that the provision of jury trials in fraudulent conveyance actions has apparently not been attended by substantial difficulties under previous bankruptcy statutes; that respondent has not pointed to any discussion of this allegedly serious problem in the legislative history of the 1978 Act or the 1984 Amendments; that in many cases defendants would likely not request jury trials; that causes of action to recover preferences may be assigned pursuant to the plan of reorganization rather than pursued prior to the plan's approval, as was done in this very case; and that Congress itself, in enacting 28 U. S. C. § 1411 (1982 ed., Supp. V), explicitly provided for jury trials of personal injury and wrongful-death claims, which would likely take much longer to try than most preference actions and which often involve large sums of money.

inconsistency between the desire for speedy justice and the right to jury trial").[18]

## V

We do not decide today whether the current jury trial provision—28 U. S. C. § 1411 (1982 ed., Supp. V)—permits bankruptcy courts to conduct jury trials in fraudulent conveyance actions like the one respondent initiated. Nor do we express any view as to whether the Seventh Amendment or Article III allows jury trials in such actions to be held before non-Article III bankruptcy judges subject to the oversight provided by the district courts pursuant to the 1984 Amendments. We leave those issues for future decisions.[19] We do hold, however, that whatever the answers to these questions, the Seventh Amendment entitles petitioners to the jury trial they requested. Accordingly, the judgment of

---

[18] One commentator has noted:

"[T]he interpretation of *Katchen* as a 'delay and expense' exception to the seventh amendment is negated by the Court's rejection of the argument that delay, or even the more significant problem of jury prejudice, can override the seventh amendment. *Katchen*'s reference to 'delay and expense' must, therefore, be read as part of the Court's consideration of whether the legal remedy had become sufficiently adequate to result in a shifting of the boundaries of law and equity. At a minimum, the delay and expense language of *Katchen* must be read in light of the petitioner's demand for a stay of the bankruptcy action and the institution of a separate suit in a different court. That is a qualitatively different type of delay and expense from the delay and expense of providing a jury trial in the same action. The latter could never override *Beacon* [*Theatres, Inc.* v. *Westover*, 359 U. S. 500 (1959),] and *Dairy Queen*[*, Inc.* v. *Wood*, 369 U. S. 469 (1962)]." Warner 39 (footnotes omitted); see *id.*, at 42, 48.

[19] JUSTICE WHITE accuses us of being "rather coy" about which statute we are invalidating, *post*, at 71, n. 2, and of "preferring to be obtuse" about which court must preside over the jury trial to which petitioners are entitled. *Post*, at 81. But however helpful it might be for us to adjudge every pertinent statutory and constitutional issue presented by the 1978 Act and the 1984 Amendments, we cannot properly reach out and decide matters not before us. The only question we have been called upon to answer in this case is whether the Seventh Amendment grants petitioners a right to a jury trial. We hold unequivocally that it does.

the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I join all but Part IV of the Court's opinion. I make that exception because I do not agree with the premise of its discussion: that "the Federal Government need not be a party for a case to revolve around 'public rights.'" *Ante,* at 54, quoting *Thomas* v. *Union Carbide Agricultural Products Co.,* 473 U. S. 568, 586 (1985). In my view a matter of "public rights," whose adjudication Congress may assign to tribunals lacking the essential characteristics of Article III courts, "must at a minimum arise 'between the government and others.'" *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.,* 458 U. S. 50, 69 (1982) (plurality opinion), quoting *Ex parte Bakelite Corp.,* 279 U. S. 438, 451 (1929). Until quite recently this has also been the consistent view of the Court. See 458 U. S., at 69, n. 23 ("[T]he presence of the United States as a proper party . . . is a necessary but not sufficient means of distinguishing 'private rights' from 'public rights'"); *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n,* 430 U. S. 442, 450 (1977) (public rights cases are "cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes"); *id.,* at 457 (noting "distinction between cases of private right and those which arise between the Government and persons subject to its authority"); *id.,* at 458 (situations involving "public rights" are those "where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights"); *Crowell* v. *Benson,* 285 U. S. 22, 50–51 (1932) (public rights are "those which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative depart-

ments"); *Ex parte Bakelite Corp., supra,* at 451 (public rights are those "arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it"); *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 283 (1856) (plaintiff's argument that a controversy susceptible of judicial determination must be a "judicial controversy" heard in an Article III court "leaves out of view the fact that the United States is a party").

The notion that the power to adjudicate a legal controversy between two private parties may be assigned to a non-Article III, yet federal, tribunal is entirely inconsistent with the origins of the public rights doctrine. The language of Article III itself, of course, admits of no exceptions; it directs unambiguously that the "judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." In *Murray's Lessee, supra,* however, we recognized a category of "public rights" whose adjudication, though a judicial act, Congress may assign to tribunals lacking the essential characteristics of Article III courts. That case involved the Act of May 15, 1820, 3 Stat. 592, which established a summary procedure for obtaining from collectors of federal revenue funds that they owed to the Treasury. Under that procedure, after a federal auditor made the determination that the funds were due, a "distress warrant" would be issued by the Solicitor of the Treasury, authorizing a United States marshal to seize and sell the personal property of the collector, and to convey his real property, in satisfaction of the debt. The United States' lien upon the real property would be effective upon the marshal's filing of the distress warrant in the district court of the district where the property was located. The debtor could, however, bring a challenge to the distress warrant in any United States district court, in which judicial challenge "every fact upon which the legality of the extra-judicial remedy depends may be drawn in[to] ques-

tion," 18 How., at 284.   *Murray's Lessee* involved a dispute over title to lands that had been owned by a former collector of customs whom the Treasury auditor had adjudged to be deficient in his remittances.   The defendant had purchased the land in the marshal's sale pursuant to a duly issued distress warrant (which had apparently not been contested by the collector in any district court proceeding).   The plaintiff, who had acquired the same land pursuant to the execution of a judgment against the collector, which execution occurred *before* the marshal's sale, but *after* the marshal's filing of the distress warrant to establish the lien, brought an action for ejectment to try title.   He argued, *inter alia*, that the process by which the defendant had obtained title violated Article III because adjudication of the collector's indebtedness to the United States was inherently a judicial act, and could not lawfully have been performed by a Treasury auditor, but only by an Article III court.   We rejected this contention by observing that although "the auditing of the accounts of a receiver of public moneys may be, in an enlarged sense, a judicial act," *id.*, at 280, the English and American traditions established that it did not, without consent of Congress, give rise to a judicial "controversy" within the meaning of Article III.

It was in the course of answering the plaintiff's rejoinder to this holding that we uttered the words giving birth to the public rights doctrine.   The plaintiff argued that if we were correct that the matter was "not in its nature a judicial controversy, congress could not make it such, nor give jurisdiction over it to the district courts" in the bills permitted to be filed by collectors challenging distress warrants — so that "the fact that congress has enabled the district court to pass upon it, is conclusive evidence that it is a judicial controversy." *Id.*, at 282.   That argument, we said, "leaves out of view the fact that the United States is a party." *Id.*, at 283.   Unlike a private party who acts extrajudicially to recapture his property, the marshal who executes a distress warrant "can-

not be made responsible in a judicial tribunal for obeying the lawful command of the government; and the government itself, which gave the command, cannot be sued without its own consent," even though the issue in question is an appropriate matter for a judicial controversy. *Ibid.* Congress could, however, waive this immunity, so as to permit challenges to the factual bases of officers' actions in Article III courts; and this waiver did not have to place the proceeding in the courts unconditionally or *ab initio,* for the "United States may consent to be sued, and may yield this consent upon such terms and under such restrictions as it may think just." *Ibid.* Thus, we summed up, in the oft-quoted passage establishing the doctrine at issue here:

> [T]here are matters, *involving public rights,* which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which Congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." *Id.,* at 284 (emphasis added).

It is clear that what we meant by public rights were not rights important to the public, or rights created by the public, but rights *of the public*—that is, rights pertaining to claims brought by or against the United States. For central to our reasoning was the device of waiver of sovereign immunity, as a means of converting a subject which, though its resolution involved a "judicial act," could not be brought before the courts, into the stuff of an Article III "judicial controversy." Waiver of sovereign immunity can only be implicated, of course, in suits where the Government is a party. We understood this from the time the doctrine of public rights was born, in 1856, until two Terms ago, saying as recently as 1982 that the suits to which it applies "must at a minimum arise 'between the government and others,'" *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.,* 458 U. S., at 69, quoting *Ex parte Bakelite Corp.,* 279

U. S., at 451. See also, in addition to the cases cited *supra*, at 65–66, *Williams* v. *United States*, 289 U. S. 553, 581 (1933) (noting sovereign immunity origins of legislative courts); *Ex parte Bakelite, supra*, at 453–454 (same). Cf. *McElrath* v. *United States*, 102 U. S. 426, 440 (1880).

In *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568 (1985), however, we decided to interpret the phrase "public rights" as though it had not been developed in the context just discussed and did not bear the meaning just described. We pronounced, as far as I can tell by sheer force of our office, that it applies to a right "so closely *integrated into a public regulatory scheme* as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Id.*, at 593–594 (emphasis added). The doctrine reflects, we announced, "simply a pragmatic understanding that when Congress selects a quasi-judicial method of resolving matters that 'could be conclusively determined by the Executive and Legislative Branches,' the danger of encroaching on the judicial powers is reduced," *id.*, at 589, quoting *Northern Pipeline, supra*, at 68—without pointing out, as had *Murray's Lessee*, that the only adjudications, of private rights that "could be conclusively determined by the Executive and Legislative Branches" were a select category of private rights vis-à-vis the Government itself. We thus held in *Thomas*, for the first time, that a purely private federally created action did not require Article III courts.

There was in my view no constitutional basis for that decision. It did not purport to be faithful to the origins of the public rights doctrine in *Murray's Lessee;* nor did it replace the careful analysis of that case with some other reasoning that identifies a discrete category of "judicial acts" which, at the time the Constitution was adopted, were not thought to implicate a "judicial controversy." The lines sought to be established by the Constitution did not matter. "Pragmatic understanding" was all that counted—in a case-by-case evaluation of whether the danger of "encroaching" on the "judi-

cial powers" (a phrase now drained of constant content) is too much. The Term after *Thomas,* in *Commodity Futures Trading Comm'n* v. *Schor,* 478 U. S. 833 (1986), we reconfirmed our error, embracing the analysis of *Thomas* and describing at greater length the new Article III standard it established, which seems to me no standard at all:

> "[I]n reviewing Article III challenges, we have weighed a number of factors, none of which has been deemed determinative, with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary. . . . Among the factors upon which we have focused are the extent to which the 'essential attributes of judicial power' are reserved to Article III courts, and, conversely, the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III." 478 U. S., at 851, citing *Thomas, supra,* at 587, 589–593.

I do not think one can preserve a system of separation of powers on the basis of such intuitive judgments regarding "practical effects," no more with regard to the assigned functions of the courts, see *Mistretta* v. *United States,* 488 U. S. 361, 426–427 (1989) (SCALIA, J., dissenting), than with regard to the assigned functions of the Executive, see *Morrison* v. *Olson,* 487 U. S. 654, 708–712 (1988) (SCALIA, J., dissenting). This central feature of the Constitution must be anchored in rules, not set adrift in some multifactored "balancing test"— and especially not in a test that contains as its last and most revealing factor "the concerns that drove Congress to depart from the requirements of Article III." *Schor, supra,* at 851.

I would return to the longstanding principle that the public rights doctrine requires, at a minimum, that the United States be a party to the adjudication. On that basis, I concur in the Court's conclusion in Part IV of its opinion that

the Article III concomitant of a jury trial could not be eliminated here. Since I join the remainder of the Court's opinion, I concur in its judgment as well.

JUSTICE WHITE, dissenting.

The Court's decision today calls into question several of our previous decisions,[1] strikes down at least one federal statute,[2] and potentially concludes for the first time that the Seventh Amendment[3] guarantees litigants in a specialized non-Article III forum the right to a jury trial. Because I cannot accept these departures from established law, I respectfully dissent.

I

Before I explore the Court's approach to analyzing the issues presented in this case, I first take up the question of the

---

[1] As I will discuss more fully below, the Court's opinion can be read as overruling or severely limiting the relevant portions of the following cases: *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442 (1977); *Katchen* v. *Landy*, 382 U. S. 323 (1966); *Block* v. *Hirsh*, 256 U. S. 135 (1921); and *Barton* v. *Barbour*, 104 U. S. 126 (1881), plus perhaps some others.

[2] Like much else about its opinion, the Court is rather coy about disclosing which federal statute it is invalidating today. Perhaps it is 28 U. S. C. § 157(b)(2)(H) (1982 ed., Supp. V), the statute which includes actions to avoid or recover fraudulent conveyances among core bankruptcy proceedings; or § 157(b)(1), which permits bankruptcy judges to enter final judgments in core proceedings (given the inclusion of fraudulent conveyance actions among these proceedings); or perhaps it is 28 U. S. C. § 1411(b) (1982 ed., Supp. V), limiting jury trial rights in bankruptcy; or perhaps some part of Title 11 itself—or some combination of the above.

There is no way for Congress, or the lower Article III courts, or the bankruptcy courts—or creditors or debtors for that matter—to know how they are expected to respond to the Court's decision, even if they wish to be diligent in conforming their behavior to today's mandate. See especially Part V, *ante*, at 64. Though the Court denies that it is being "coy" or "obtuse," it steadfastly refuses to the end to disclose which statute it finds unconstitutional today. See *ante*, at 64, n. 19.

[3] The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."

precedent that the Court most directly disregards today, *Katchen* v. *Landy*, 382 U. S. 323 (1966). Though the Court professes not to overrule this decision, and curiously, to be acting in reliance on it, see *ante*, at 57–59, there is simply no way to reconcile our decision in *Katchen* with what the Court holds today.

In *Katchen*, the petitioner filed a claim in the bankruptcy proceeding to recover funds that he alleged were due to him from a bankrupt estate; respondent, the trustee, resisted paying the claims based on § 57g of the old Bankruptcy Act, which forbade payments to creditors holding "void or voidable" preferences. Petitioner claimed, much as petitioners here do, that the question whether prior payments to him were preferences was a matter that could not be adjudicated without the benefit of a jury trial. We rejected this claim, holding that "there is no Seventh Amendment right to a jury trial" on claims such as Katchen's. *Katchen*, 382 U. S., at 337. Not only could the issue of preference be tried without a jury for the purpose of denying the filed claim pursuant to § 57g, but a money judgment for the amount of the preference could be entered without a jury trial: "[I]t makes no difference, so far as petitioner's Seventh Amendment claim is concerned, whether the bankruptcy trustee urges only a § 57g objection or also seeks affirmative relief." *Id.*, at 337–338. This holding dispositively settles the question before us today: like the petitioner in *Katchen*, petitioners in this case have no Seventh Amendment right to a jury trial when respondent trustee seeks to avoid the allegedly fraudulent transfers they received.

In order to escape the force of *Katchen*'s holding, the Court exploits the circumstances under which that decision was made. Most notably, at the time *Katchen* was decided, the Bankruptcy Act then in force (the 1898 Act) did not include actions to set aside voidable preferences among those proceedings covered by the Act. Thus, the clause of our opinion in *Katchen*, *supra*, at 336, on which the Court today puts so

much weight—"petitioner might be entitled to a jury trial on the issue of preference if he presented no claim in the bankruptcy proceeding and awaited a federal plenary action by the trustee," see *ante,* at 58—simply stated the truism that, under the 1898 Act in force at that time, if petitioner had not presented his claim to the bankruptcy court, that court would have had no jurisdiction to perform a summary adjudication of the preference.

That entitlement, however, on which the Court so heavily relies, was solely the product of the statutory scheme in existence at the time. If it were not, the next phrase appearing in the *Katchen* decision would make little sense: "[W]hen the same issue [*i. e.,* validity of a preference] arises as part of the process of allowance and disallowance of claims, it is triable in equity." *Katchen, supra,* at 336. *Katchen* makes it clear that when Congress does commit the issue and recovery of a preference to adjudication in a bankruptcy proceeding, the Seventh Amendment is inapplicable. Only the limits of the 1898 Act prevented this from being the case in *all* instances, and thereby, left Katchen with the possibility of a jury trial right.

Today's Bankruptcy Code is markedly different. Specifically, under the Bankruptcy Amendments and Federal Judgeship Act of 1984 (1984 Amendments), an action to recover fraudulently transferred property has been classified as a "core" bankruptcy proceeding. See 28 U. S. C. § 157(b)(2) (H) (1982 ed., Supp. V). While in Katchen's day, it was only in special circumstances that adjudicating a preference was committed to bankruptcy proceedings, today, Congress has expressly designated adjudication of a preference or a fraudulent transfer a "core" bankruptcy proceeding. The portion of *Katchen* on which the Court relies—"'petitioner might be entitled to a jury trial on the issue of preference if he presented no claim in the bankruptcy proceeding and awaited a federal plenary action by the trustee,'" see *ante,* at 58—is therefore a relic of history. The same is true of the decision in *Schoen-*

*thal* v. *Irving Trust Co.*, 287 U. S. 92, 94–95 (1932), which, in holding that "[s]uits to recover preferences constitute no part of the proceedings in bankruptcy," merely reflected the then-existing statutory scheme.

The Court recognizes the distinction between the earlier law and the present Code, but calls the change a "purely taxonomic" one that "cannot alter our Seventh Amendment analysis." *Ante,* at 61. I disagree for two reasons. First, the change is significant because it illustrates the state of the law at the time of *Katchen,* and explains why that case came out as it did. It is hypocritical for the Court to rely on *Katchen*'s statement as to the existence of a jury trial entitlement for the petitioner's claim there, but then dismiss as "taxonomic" the change that wiped out that jury entitlement — or, at the very least, profoundly shifted the basis for it.

More fundamentally, the inclusion of actions to recover fraudulently conveyed property among core bankruptcy proceedings has meaning beyond the taxonomic. As I explain in more detail below, see Part II–A, *infra,* we have long recognized that the forum in which a claim is to be heard plays a substantial role in determining the extent to which a Seventh Amendment jury trial right exists. As we put it in *Katchen:*

> " '[I]n cases of bankruptcy, many incidental questions arise in the course of administering the bankrupt estate, which would ordinarily be pure cases at law, and in respect of their facts triable by jury, but, as belonging to bankruptcy proceedings, they become cases over which the bankruptcy court, which acts as a court of equity, exercises exclusive control. Thus a claim of debt or damages against the bankrupt is investigated by chancery methods.' " *Katchen, supra,* at 337 (quoting *Barton* v. *Barbour,* 104 U. S. 126, 133–134 (1881)).

The same is true here, and it counsels affirmance under our holding in *Katchen.*

In essence, the Court's rejection of *Katchen*—and its classification of the change effected by the 1984 Act as "taxonomic"—comes from its conclusion that the fraudulent conveyance action at issue here is not "'part of the process of allowance and disallowance of claims.'" *Ante*, at 58 (quoting *Katchen*, 382 U. S., at 336). The Court misses *Katchen*'s point, however: it was the fact that *Congress* had committed the determination and recovery of preferences to bankruptcy proceedings that was determinative in that case, not just the bare fact that the action "happened" to take place in the process of adjudicating claims. And the same determinative element is present here, for under the 1984 Amendments, Congress unmistakably intended to have fraudulent conveyances adjudicated and recovered in the bankruptcy court in accordance with that court's usual procedures.

Perhaps in this respect the Court means something more akin to its later restatement of its position; namely, that the 1984 Amendments simply "reclassified a pre-existing, common-law cause of action that was not integrally related to the reformation of debtor-creditor relations." *Ante*, at 60. The Court further indicates that it will pay little heed to the congressional inclusion of avoidance and recovery proceedings in core bankruptcy jurisdiction since that choice was not made "because [Congress found that] traditional rights and remedies were inadequate to cope with a manifest public problem."[4] *Ibid.* This misguided view of the con-

---

[4] In addition to the points I make below, I disagree with the Court's portrayal of Congress' expansion of bankruptcy jurisdiction to include actions such as this one as an act of whimsy. In fact, when (in 1978) Congress first swept proceedings like the fraudulent conveyance suit before us into the jurisdiction of the bankruptcy courts, it was legislating out of a sense that "traditional rights and remedies were inadequate to cope with a manifest public problem":

"A major impetus underlying this reform legislation has been the need to enlarge the jurisdiction of the bankruptcy court in order to eliminate the serious delays, expense and duplications associated with the current dichotomy between summary and plenary jurisdiction . . . . [T]he jurisdic-

gressional enactment is the crux of the problem with the Court's approach.

How does the Court determine that an action to recover fraudulently conveyed property is not "integrally related" to the essence of bankruptcy proceedings? Certainly not by reference to a current statutory definition of the core of bank-

---

tional limitations presently imposed on the bankruptcy courts have embroiled the court and the parties in voluminous litigation . . . ." S. Rep. No. 95–989, p. 17 (1978).

This rather plain statement by Congress makes it clear that it found the system in place at the time grossly inadequate, and perceived a "manifest public" need for change. See also H. R. Rep. No. 95–595, p. 445 (1977).

In response to this legislative history, the Court makes two points. First, the Court observes that these Reports concerned the 1978 Code, and not the 1984 Amendments; it was the latter, the Court notes, that stripped petitioners of their jury trial right. *Ante*, at 61–62, n. 16. While the Court's analysis is technically correct, it ignores the fact that the 1978 Code undertook—to use the Court's own description—a "radical refor[m]" of bankruptcy law, *ibid.*, including the absorption of fraudulent preference actions into what used to be the plenary jurisdiction of bankruptcy courts. It was this change which laid the groundwork for the post-*Northern Pipeline* Act at issue here.

Second, and more importantly, the Court acknowledges that when Congress adopted the 1984 Amendments, it was motivated by the same "efficiency" concerns that were the basis for the 1978 legislation. *Ante*, at 61–62, n. 16. Thus, the Court concedes the fundamental point that Congress modified the traditional jurisdictional scheme concerning fraudulent conveyance actions because Congress found that this traditional approach was "inadequate to cope with a manifest public problem"; under *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442 (1977)—even under the Court's own description of that case, *ante* at 60—this should suffice to permit Congress to limit jury trial rights on such claims.

Instead of so concluding, however, the Court retreats from *Atlas Roofing* and its earlier analysis, and holds that Congress' enactments do not control here because, in adopting them, Congress failed to make a "considered judgment of the constitutionality of [these] change[s]." *Ante*, at 62, n. 16. As I observe below, *infra*, at 87–88, elevating this inquiry to bellwether status is unprecedented in our Seventh Amendment cases—and unwise.

ruptcy proceedings — enacted by Congress under its plenary constitutional power, see U. S. Const., Art. I, § 8, cl. 4, to establish bankruptcy laws. As discussed in the preceding paragraph, this vision of what is "integrally related" to the resolution of creditor-debtor conflicts includes the sort of action before us today. See 28 U. S. C. § 157(b)(2)(H) (1982 ed., Supp. V). Nor does the Court find support for its contrary understanding in petitioners' submission, which concedes that the action in question here is brought to "recover monies that are properly part of the debtor's estate and should be ratably distributed among creditors," and that fraudulent transfers put at risk "the basic policy of non-discriminatory distribution that underlies the bankruptcy law." Brief for Petitioners 12. This, too, seems to belie the Court's view that actions to set aside fraudulent conveyances are not "integrally related" to reforming creditor-debtor relations.

Nor is the Court's conclusion about the nature of actions to recover fraudulently transferred property supportable either by reference to the state of American bankruptcy law prior to adoption of the 1978 Code, or by reference to the pre-1791 practice in the English courts. If the Court draws its conclusions based on the fact that these actions were not considered to be part of bankruptcy proceedings under the 1800 or 1898 Bankruptcy Acts (or, more generally, under federal bankruptcy statutes predating the 1978 Code), it has treated the power given Congress in Article I, § 8, cl. 4, as if it were a disposable battery, good for a limited period only — once the power in it has been consumed by use, it is to be discarded and considered to have no future value. The power of Congress under this Clause is plainly not so limited: merely because Congress *once* had a scheme where actions such as this one were solely heard in plenary proceedings in Article III courts — where the Seventh Amendment attached — does not impugn the legality of every other possible arrangement. See also Part II–B, *infra*.

Perhaps instead the Court rests its conclusion on the practice of the 18th-century English courts. I take issue with this view of the old English law, below. But even if this were correct, I do not see why the Article I, §8, power should be so restricted. See *ibid.*

One final observation with respect to *Katchen*. The Court attempts to distinguish *Katchen* by saying that a jury trial was not needed there because the funds in dispute were part of the "bankruptcy estate." *Ante*, at 57. "Our decision [in *Katchen*] turned . . . on the bankruptcy court's having 'actual or constructive possession' of the bankruptcy estate," the Court writes. *Ibid.* (quoting 382 U. S., at 327). But obviously in this case, the Bankruptcy Court similarly had "'actual or constructive possession' of the bankruptcy estate"; certainly it had as much constructive possession of the property sought as it had of the preference recovered in *Katchen*. Thus, it is as true here as it was in *Katchen* that the funds in dispute are part of the "bankruptcy estate." The Bankruptcy Code defines that estate to be comprised of "all the following property, wherever located and by whomever held," including "[a]ny interest in property that the trustee recovers under" the provision authorizing actions to recover fraudulently transferred property. 11 U. S. C. §§ 541(a)(3), 550 (1982 ed., Supp. V). Consequently, even if the Court is accurate in pinpointing the dispositive fact in the *Katchen* decision, that fact equally points towards a ruling for the trustee here.

In sum, I find that our holding in *Katchen*, and its underlying logic, dictate affirmance. The Court's decision today amounts to nothing less than a *sub silentio* overruling of that precedent.

## II

Even if the question before us were one of first impression, however, and we did not have the decision in *Katchen* to guide us, I would dissent from the Court's decision. Under our cases, the determination whether the Seventh Amendment guarantees a jury trial on petitioners' claims must turn

on two questions: first, in what forum will those claims be heard; and second, what is the nature of those claims. A weighing of both of these factors must point toward application of the Seventh Amendment before that guarantee will attach.[5]

## A

To read the Court's opinion, one might think that the Seventh Amendment is concerned only with the nature of a claim. If a claim is legal, the Court announces, then the Seventh Amendment guarantees a jury trial on that claim. *Ante*, at 42, n. 4. This is wrong. "[H]istory and our cases support the proposition that the right to a jury trial turns not solely on the nature of the issue to be resolved but also on the forum in which it is to be resolved," *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442, 460–461 (1977). Perhaps like *Katchen, Atlas Roofing* is no longer good law after today's decision. A further examination of the issue before us reveals, though, that it is the

---

[5] Since both of the relevant factors point against application of the Seventh Amendment here, resolving this case does not require offering some comprehensive view of how these factors are to be balanced. The ambiguity, however, is not of my creation, but rather, comes from the apparent inconsistency of our case law. For example, cases brought in state courts are *never* subject to the Seventh Amendment, no matter the nature of the claim; conversely, under the Court's decision in *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50 (1982), the sort of state-law contract claim at issue there could *never* be assigned by Congress to anything other than an Article III tribunal, in which the Seventh Amendment would apply. See also *post*, at 93 (BLACKMUN, J., dissenting). Other cases look at both factors, without being altogether clear on their relative import.

Whatever the shortcomings of this opinion for failing to resolve the difficult balancing question, it remains superior to the Court's method of "balancing" these concerns, which amounts to no balancing at all—and instead focuses solely on the nature of claim (*i. e.*, whether it is legal, and whether it concerns a public right, see *ante*, at 42, n. 4) in determining if the Seventh Amendment applies.

Court's decision today, and not our prior rulings, that is in error.

In the most obvious case, it has been held that the Seventh Amendment does not apply when a "suit at common law" is heard in a state court. *Minneapolis & St. L. R. Co.* v. *Bombolis*, 241 U. S. 211, 217 (1916); *Woods* v. *Holy Cross Hospital*, 591 F. 2d 1164, 1171, n. 12 (CA5 1979). Even with its exclusive focus on the claim at issue here, the Court does not purport to hold that a fraudulent conveyance action brought in state court would be covered by the Seventh Amendment, because that action was one at "common law" in the Court's view.

Nor does the Seventh Amendment apply in all federal forums. "[T]he Seventh Amendment is not applicable to administrative proceedings," for example. *Tull* v. *United States*, 481 U. S. 412, 418, n. 4 (1987). In these forums "'where jury trials would be incompatible with the whole concept of administrative adjudication,'" the Seventh Amendment has no application. *Atlas Roofing Co., supra*, at 454 (emphasis deleted) (quoting *Pernell* v. *Southall Realty*, 416 U. S. 363, 383 (1974)). Thus, we have often looked at the character of the federal forum in which the claim will be heard, asking if a jury has a place in that forum, when determining if the Seventh Amendment's guarantee of a jury trial will apply there.

Most specifically relevant for this case, we have indicated on several previous occasions that bankruptcy courts—by their very nature, courts of equity—are forums in which a jury would be out of place. "[A] bankruptcy court . . . [is] a specialized court of equity . . . a forum before which a jury would be out of place," *Atlas Roofing, supra*, at 454, n. 11; consequently, the Seventh Amendment has no application to these courts. "[T]he Court [has] recognized that a bankruptcy court has been traditionally viewed as a court of equity, and that jury trials would 'dismember' the statutory scheme of the Bankruptcy Act." *Curtis* v. *Loether*, 415

U. S. 189, 195 (1974). *Atlas Roofing*, *Curtis*, and countless other cases have recognized that Congress has the power to "entrust enforcement of statutory rights to [a] . . . specialized court of equity free from the strictures of the Seventh Amendment." *Curtis*, *supra*, at 195. Prior cases emphatically hold that bankruptcy courts are such specialized courts of equity. Indeed, we have stated that "bankruptcy courts are inherently proceedings in equity." *Katchen* v. *Landy*, 382 U. S., at 336; see also *Local Loan Co.* v. *Hunt*, 292 U. S. 234, 240 (1934).

Before today, this Court has never held that a party in a bankruptcy court has a Seventh Amendment right to a jury trial on its claims. Of course, the Court does not actually so hold today, preferring to be obtuse about just where petitioners are going to obtain the jury trial to which the Court deems them entitled. See *ante*, at 64. But in blithely ignoring the relevance of the forum Congress has designated to hear this action—focusing instead exclusively on the "legal" nature of petitioners' claim—the Court turns its back on a long line of cases that have rested, in varying degrees, on that point. The Court's decision today ignores our statement in *Atlas Roofing* that "even if the Seventh Amendment would have required a jury where the adjudication of [some types of] rights is assigned to a federal court of law instead of an administrative agency," this constitutional provision does not apply when Congress assigns the adjudication of these rights to specialized tribunals where juries have no place. *Atlas Roofing*, 430 U. S., at 455. Indeed, we observed in *Atlas Roofing* that it was even true in "English or American legal systems at the time of the adoption of the Seventh Amendment [that] the question whether a fact would be found by a jury turned to a considerable degree on the nature of the forum in which a litigant found himself." *Id.*, at 458.

The Court's decision also substantially cuts back on Congress' power to assign selected causes of action to specialized forums and tribunals (such as bankruptcy courts), by holding

that these forums will have to employ juries when hearing claims like the one before us today—a requirement that subverts in large part Congress' decision to create such forums in the first place. Past decisions have accorded Congress far more discretion in making these assignments. Thus, *Block* v. *Hirsh,* 256 U. S. 135, 158 (1921), found that a Seventh Amendment "objection amount[ed] to little" when Congress assigned what was, in essence, a common-law action for ejectment to a specialized administrative tribunal. We reiterated the vitality of *Block* v. *Hirsh* as recently as our decision in *Pernell* v. *Southall Realty, supra,* at 383, and the principle was reaffirmed in several cases between these two decisions. See n. 10, *infra.* In *Pernell,* referring to *Block* v. *Hirsh,* we stated that "the Seventh Amendment would not be a bar to a congressional effort to entrust landlord-tenant disputes, including those over the right to possession, to an administrative agency." *Pernell, supra,* at 383. Yet to the extent that such disputes involve matters that are "legal" in nature—as they clearly do—the Court's decision today means that Congress cannot do what we said in *Block* and *Pernell* that it could.[6]

Finally, the Court's ruling today ignores several additional reasons why juries have no place in bankruptcy courts and other "specialized courts of equity" like them. First, two of the principal rationales for the existence of the Seventh Amendment guarantee—the notions of "jury equity" and of juries serving as popular checks on life-tenured judges—are inapt in bankruptcy courts. As one scholar noted:

"We have kept the *civil* jury . . . as a check on the federal judge whose life tenure makes [him] suspect [under]

---

[6] Our decision in *Katchen,* 382 U. S., at 336 —which described the 1898 Act as "convert[ing] [a] legal claim into an equitable claim"—is often cited for the same principle; *i. e.,* as upholding "the power of Congress to take some causes of action outside the scope of the Seventh Amendment by providing for their enforcement . . . in a specialized court." See J. Friedenthal, M. Kane, & A. Miller, Civil Procedure 498 (1985).

. . . the Populist traditions of this country. The function of the civil jury is to diffuse the otherwise autocratic power and authority of the judge.

"This . . . function . . . has little application to nontraditional civil proceedings such as those which occur in bankruptcy . . . . The condition of autocracy which would bring the underlying values of the Seventh Amendment [into force] is not present; the right to jury trial therefore has no application." Hearings on S. 558 before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, the 100th Cong., 1st. Sess., 572–573 (1987) (statement of Paul Carrington).

Others have made this same observation. See, e. g., id., at 684–685 (statement of Prof. Rowe). Cf., e. g., In re Japanese Electronic Products Antitrust Litigation, 631 F. 2d 1069, 1085 (CA3 1980). As respondent put it: "A jury in an equitable tribunal such as a bankruptcy court would in a sense be redundant." Brief for Respondent 22.

Beyond its redundancy, a requirement that juries be used in bankruptcy courts would be disruptive and would unravel the statutory scheme that Congress has created. The Court dismisses this prospect, and scoffs that it "can[not] seriously be argued that permitting jury trials" on this sort of claim would undermine the statutory bankruptcy scheme. Ante, at 61. Yet this argument has not only been "seriously" made, it was actually accepted by this Court in Curtis v. Loether, 415 U. S. 189 (1974). In Curtis, we observed that Katchen had rejected a Seventh Amendment claim (similar to the one before us today), due to our "recogni[tion] that a bankruptcy court has been traditionally viewed as a court of equity, and that jury trials would 'dismember' the statutory scheme of the Bankruptcy Act." Curtis, supra, at 195; see also Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n, 430 U. S., at 454, n. 11. I fear that the Court's decision today will have the desultory effect we feared when Curtis was decided.

## B

The above is not to say that Congress can vitiate the Seventh Amendment by assigning any claim that it wishes to a specialized tribunal in which juries are not employed. Cf. *Atlas Roofing, supra*, at 461, n. 16. Our cases require a second inquiry—the one that the Court focuses exclusively upon—concerning the nature of the claim so assigned.

To resolve this query, the Court properly begins its analysis with a look at English practice of the 18th century. See *ante*, at 43–47. After conducting this review, the Court states with confidence that "in 18th-century England . . . a court of equity would not have adjudicated" respondent's suit. *Ante*, at 47. While I agree that this action could have been brought at law—and perhaps even that it might have been so litigated in the most common case—my review of the English cases from the relevant period leaves me unconvinced that the chancery court would have *refused* to hear this action—the Court's conclusion today.

The Court itself confesses that "courts of equity sometimes provided relief in fraudulent conveyance actions." *Ante*, at 43. The Chancery Court put it stronger, though: "Courts of Equity have most certainly been in the habit of exercising a concurrent jurisdiction with the Courts of Law on the statutes of *Elizabeth* respecting fraudulent conveyances." *Hobbs* v. *Hull*, 1 Cox 445, 445–446, 29 Eng. Rep. 1242 (1788). Rarely has a more plain statement of the prevailing English practice at the time of ratification of the Seventh Amendment been discovered than this one; this alone should be enough to make respondent's case. Yet instead of accepting the pronouncement of the equity court about its own jurisdiction, this Court assumes the role of High Court of Historical Review, questioning the soundness of *Hobbs'* decision because it was issued without adequate supporting citations. *Ante*, at 45–46. A similar criticism is levied against another case from the same period, *Ex parte Scudamore*, 3 Ves. jun. 85,

30 Eng. Rep. 907 (Ch. 1796), which, as even the Court concedes, "demonstrates that fraudulent conveyance actions could be brought in equity." *Ante* at 45.

In addition to nitpicking respondent's supporting case law into oblivion, the Court's more general rejection of respondent's claim rests on two sources: a passing citation to a wholly inapposite case, *Buzard* v. *Houston,* 119 U. S. 347 (1886); and a more lengthy quotation from Professor Glenn's treatise on fraudulent conveyances. See *ante,* at 44. I will not deny that Professor Glenn's work supports the historical view that the Court adopts today. But notwithstanding his scholarly eminence, Professor Glenn's view of what the 18th-century English equity courts would have done with an action such as this one is not dispositive. Other scholars have looked at the same history and come to a different conclusion.[7] Still others have questioned the soundness of the distinction that Professor Glenn drew—between suits to set aside monetary conveyances and suits to avoid the conveyances of land—as unwise or unsupported. See, *e. g., In re Wencl,* 71 B. R. 879, 883, n. 2 (Bkrtcy. Ct., DC Minn. 1987). Indeed, just a few pages after it rests its analysis of the 18th-century case law on Professor Glenn's writing, the Court itself dismisses this aspect of Professor Glenn's historical conclusions. See *ante,* at 46, n. 5. The Court embraces Professor Glenn's treatise where it agrees with it and calls it authoritative, while rejecting the portions it finds troublesome.

Trying to read the ambiguous history concerning fraudulent conveyance actions in equity—a task which the Court finds simple today—has perplexed jurists in each era, who have come to conflicting decisions each time that the question has found relevance. Even in *Schoenthal*'s time, and under

---

[7] See, *e. g.,* 4 Collier on Bankruptcy ¶ 548.10, p. 548–125 (15th ed. 1989); O. Bump, Conveyances Made by Debtors to Defraud Creditors § 532 (4th ed. 1896); F. Wait, Fraudulent Conveyances and Creditors' Bills §§ 56–60 (1884); *Drake* v. *Rice,* 130 Mass. 410, 412 (1881) (Gray, C. J.); W. Roberts, Voluntary and Fraudulent Conveyances 525–526 (3d Am. ed. 1845).

the statutory regime applicable when that case was decided, many courts reviewing the same historical sources considered by us today had concluded that actions such as this one sounded in equity. See *Schoenthal* v. *Irving Trust Co.*, 287 U. S., at 96, n. 3; Note, 42 Yale L. J. 450, 450–452 (1933). In more recent times, an impressive collection of courts have come to a similar conclusion, finding that actions to avoid fraudulent conveyances were historically considered equitable in nature.[8]

In sum, I do not think that a fair reading of the history — our understanding of which is inevitably obscured by the passage of time and the irretrievable loss of subtleties in interpretation—clearly proves or disproves that respondent's action would have sounded in equity in England in 1791.[9]

---

[8] See, *e. g.*, *In re Graham*, 747 F. 2d 1383, 1387 (CA7 1984); *Damsky* v. *Zavatt*, 289 F. 2d 46, 53 (CA2 1961) (Friendly, J.) (an action by a bankruptcy trustee to "set aside a fraudulent conveyance has long been cognizable in equity"); *Johnson* v. *Gardner*, 179 F. 2d 114, 116–117 (CA9 1949). See also *In re Harbour*, 840 F. 2d 1165, 1172–1178 (CA4 1988); *In re I. A. Durbin, Inc.*, 62 B. R. 139, 145 (SD Fla. 1986); *In re Hendon Pools of Michigan, Inc.*, 57 B. R. 801, 802–803 (ED Mich. 1986); *In re Southern Industrial Banking Corp.*, 66 B. R. 370, 372–375 (Bkrtcy Ct., ED Tenn. 1986).

[9] Nor do I think it clear, as the Court seems to, that simply because the remedy sought by respondent can be expressed in monetary terms, the relief he seeks is therefore "legal" in nature, and not equitable. *Ante*, at 47–49.

This Court has not accepted the view that "any award of monetary relief must necessarily be 'legal' relief." *Curtis* v. *Loether*, 415 U. S. 189, 196 (1974). We have previously recognized that actions to disgorge improperly gained profits, *Tull* v. *United States*, 481 U. S. 412, 424 (1987), to return funds rightfully belonging to another, *Curtis*, *supra*, at 197, or to submit specific funds wrongfully withheld, *Bowen* v. *Massachusetts*, 487 U. S. 879, 893–896 (1988), are all equitable actions—even though the relief they seek is monetary—because they are restitutionary in nature. Respondent's action against petitioners is of the same class, seeking a similar remedy.

Here the trustee is simply "ask[ing] the court to act in the public interest by restoring the status quo and ordering the return of that which rightfully

With the historical evidence thus in equipoise—and with the nature of the relief sought here not dispositive either, see n. 8, *supra*—we should not hesitate to defer to Congress' exercise of its power under the express constitutional grant found in Article I, § 8, cl. 4, authorizing Congress "[t]o establish . . . uniform Laws on the subject of Bankruptcies." Congress has exercised that power, defining actions such as the one before us to be among the "core" of bankruptcy proceedings, triable in a bankruptcy court before a bankruptcy judge and without a jury. I would defer to these decisions.

The Court, however, finds that some (if not all) of these congressional judgments are constitutionally suspect. While acknowledging that "[t]o be sure, we owe some deference to Congress' judgment after it has given careful consideration to" such a legislative enactment, the Court declines to defer here because "respondent has adduced no evidence that Congress considered the constitutional implications of its designation of all fraudulent conveyance actions as core proceedings." *Ante*, at 61. See also *ante*, at 61–62, n. 16. This statement is remarkable, for it should not be assumed that Congress in enacting 28 U. S. C. § 157(b)(2)(H) (1982 ed., Supp. V) ignored its constitutional implications.[10] The Court

---

belongs" to the estate; "[s]uch action is within . . . the highest tradition of a court of equity." *Porter* v. *Warner Co.*, 328 U. S. 395, 402 (1946). It should not matter whether respondent is seeking to have returned the precise cashier's checks that petitioner Medex had in its possession at one time, or the funds yielded to Medex by cashing those checks. To turn the case on this distinction would only give entities in Medex's position an incentive to consummate fraudulent transfers as quickly as possible: hardly a desirable one. A host of Bankruptcy Courts have recognized as much. See, *e. g.*, *In re Wencl*, 71 B. R. 879, 883–884, and n. 2 (DC Minn. 1987); *In re Reda, Inc.*, 60 B. R. 178, 181 (ND Ill. 1986).

[10] An irony of the Court's rebuke of Congress is that Congress' decision to include actions to avoid or recover fraudulent conveyances among "core" bankruptcy proceedings found its inspiration in the "Emergency Rule" drafted and issued by the Administrative Office of the United States Courts on December 3, 1982, to govern practice in the bankruptcy courts following our decision in *Northern Pipeline*. See Emergency Rule § d(3)(A)

does not say from where it draws its requirement that the Congress must provide us with some indication that it considered the constitutional dimensions of its decision before acting, as a prerequisite for obtaining our deference to those enactments.[11]

Moreover, the Court's cramped view of Congress' power under the Bankruptcy Clause to enlarge the scope of bankruptcy proceedings, ignoring that changing times dictate changes in these proceedings, stands in sharp contrast to a more generous view expressed some years ago:

> "The fundamental and radically progressive nature of [congressional] extensions [in the scope of bankruptcy laws] becomes apparent upon their mere statement . . . . Taken altogether, they demonstrate in a very striking way the capacity of the bankruptcy clause to meet new conditions as they have been disclosed as a result of the tremendous growth of business and development of

("Related proceedings do not include . . . proceedings to set aside preferences and fraudulent conveyances"); see also *Addison* v. *O'Leary*, 68 B. R. 487, 491 (ED Va. 1986) ("[T]he jurisdictional provisions of the 1984 Bankruptcy Amendments closely parallel the Emergency Reference Rule"); G. Treister, J. Trost, L. Forman, K. Klee, & R. Levin, Fundamentals of Bankruptcy Law § 2.01(a), p. 31 (2d ed. 1988) (describing this portion of the Emergency Rule as the "forerunner" of the 1984 Amendments).

We learn today that, in retrospect, the Emergency Rule, too, was unconstitutional in its failure to include a jury trial right for actions to avoid fraudulent conveyances. It appears that it was not only Congress that failed in its duty to give adequate "consider[ation] [to] the constitutional implications of its" actions. Cf. *ante*, at 61.

[11] This is particularly unfortunate because today's ruling may be the first time ever that the Court has struck down a congressional designation of a particular cause of action as "equitable" in nature. See Note, Congressional Provision for Nonjury Trials, 83 Yale L. J. 401, 414–415 (1973) ("[T]he Court has never rejected a congressional indication that an action is equitable in nature"); but cf. *Curtis* v. *Loether*, *supra* ("re-interpreting" congressional enactment to respond to Seventh Amendment "concerns").

In the past, we have been far more deferential to Congress' designations in this regard. See, *e. g.*, *Mitchell* v. *Robert DeMario Jewelry, Inc.*, 361 U. S. 288, 290–295 (1960); *Porter* v. *Warner*, *supra*, at 397–402.

human activities from 1800 to the present day. And these acts, far-reaching though they may be, have not gone beyond the limit of congressional power; but rather have constituted extensions into a field whose boundaries may not yet be fully revealed." *Continental Illinois National Bank* v. *Chicago, R. I. & P. R. Co.*, 294 U. S. 648, 671 (1935).

See also *Katchen* v. *Landy*, 382 U. S., at 328–329.

One of that period's leading constitutional historians expressed the same view, saying that the Framers of the Bankruptcy Clause "clearly understood that they were not building a straight-jacket to restrain the growth and shackle the spirits of their descendents for all time to come," but rather, were attempting to devise a scheme "which, while firm, was nevertheless to be flexible enough to serve the varying social needs of changing generations." C. Warren, Bankruptcy in United States History 4 (1935). Today, the Court ignores these lessons and places a straitjacket on Congress' power under the Bankruptcy Clause: a straitjacket designed in an era, as any reader of Dickens is aware, that was not known for its enlightened thinking on debtor-creditor relations.

Indeed, the Court calls into question the longstanding assumption of our cases and the bankruptcy courts that the equitable proceedings of those courts, adjudicating creditor-debtor disputes, are adjudications concerning "public rights." See *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 71 (1982); *id.*, at 91 (REHNQUIST, J., concurring in judgment); *id.*, at 92 (Burger, C. J., dissenting); *id.*, at 108–118 (WHITE, J., dissenting). The list of lower court opinions that have reasoned from this assumption is so lengthy that I cannot reasonably include it in the text; a mere sampling fills the margin.[12] Yet today the Court calls

---

[12] Such cases decided since *Northern Pipeline*, from the Court of Appeals alone, include *In re Harbour*, 840 F. 2d, at 1177–1178; *In re Wood*, 825 F. 2d 90, 95–98 (CA5 1987); *In re Mankin*, 823 F. 2d 1296, 1307–1308 (CA9 1987), cert. denied *sub nom. Munn* v. *Duck*, 485 U. S. 1006 (1988); *In re*

all of this into doubt merely because these cases have been subjected to "substantial scholarly criticism." *Ante*, at 56, n. 11.[13]    If no part of bankruptcy proceedings involve the adjudication of public rights, as the Court implies today, then *all* bankruptcy proceedings are saved from the strictures of the Seventh Amendment only to the extent that such proceedings are the descendants of earlier analogues heard in equity in 18th-century England.    Because, as almost every historian has observed, this period was marked by a far more restrictive notion of equitable jurisdiction in bankruptcies, see, *e. g.*, Warren, *supra*, at 3–5, the Court's decision today may threaten the efficacy of bankruptcy courts as they are now constituted.    I see no reason to use the Seventh Amendment as a tool to achieve this dubious result.

## III

Because I find the Court's decision at odds with our precedent, and peculiarly eager to embark on an unclear

---

*Arnold Print Works*, 815 F. 2d 165, 168–170 (CA1 1987); *Briden* v. *Foley*, 776 F. 2d 379, 381 (CA1 1985); and *In re Kaiser*, 722 F. 2d 1574, 1580, and n. 2 (CA2 1983).    Many more such cases are found in the reports of the decisions of the District Courts and the Bankruptcy Courts.

[13] This is indicative of the Court's approach throughout its opinion: virtually every key holding announced today rests on a citation to scholarly authority, and not to any precedent of the Court.    This includes the Court's holdings that the action at issue here was cognizable only at law in 18th-century England, *ante*, at 44; that fraudulent conveyance actions "more nearly resemble state-law contract claims . . . than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res," *ante*, at 56; and that Congress could not eliminate a jury trial right in this sort of action by placing it in "a specialized court of equity," *ante*, at 61—in short, the three critical holdings issued by the Court in its opinion.

Like the Court, I think the analysis of learned commentators is a useful tool to enhance our understanding of the law in a field such as bankruptcy. Unlike the Court, however, I would not use the views of these scholars as *the* basis for disposing of the case before us—particularly where those views counsel rejection of otherwise viable strains in our case law.    See, *e. g.*, Gibson, Jury Trials in Bankruptcy, 72 Minn. L. Rev. 967, 1040–1041, n. 347 (1988) (cited *ante*, at 56, n. 11).

course in Seventh Amendment jurisprudence, I respectfully dissent.[14]

JUSTICE BLACKMUN, with whom JUSTICE O'CONNOR joins, dissenting.

I agree generally with what JUSTICE WHITE has said, but write separately to clarify, particularly in my own mind, the nature of the relevant inquiry.

Once we determine that petitioners have no statutory right to a jury trial, we must embark on the Seventh Amendment inquiry set forth in *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n,* 430 U. S. 442 (1977). First, we must determine whether the matter to be adjudicated is "legal" rather than "equitable" in nature, a determination which turns on the nature of the claim and of the relief sought. If the claim and the relief are deemed equitable, we need go no further: the Seventh Amendment's jury-trial right applies only to actions at law.

In this case, the historical inquiry is made difficult by the fact that, before the Federal Rules of Civil Procedure unified law and equity, parties might have been drawn to the equity side of the court because they needed its procedural tools and interim remedies: discovery, accounting, the power to clear title, and the like. In light of the frequency with which these tools were likely needed in fraud cases of any kind, it is no surprise that, as JUSTICE WHITE points out, fraudulent conveyance actions, even if cognizable at law, often would be found on the equity docket. See generally O. Bump, Conveyances Made by Debtors to Defraud Creditors § 532 (4th ed. 1896); F. Wait, Fraudulent Conveyances and Creditors' Bills §§ 59–60 (1884); W. Roberts, Voluntary and Fraudulent

---

[14] Because I do not believe that either petitioner is entitled to a jury trial under the Seventh Amendment, I do not reach the question whether petitioner Granfinanciera is deprived of any Seventh Amendment rights it might otherwise have due to its status as an instrument of a foreign sovereign. Like the Court, I would "leave for another day" the resolution of this difficult question. *Ante,* at 40.

Conveyances 525–526 (3d Am. ed. 1845). This procedural dimension of the choice between law and equity lends a tentative quality to any lessons we may draw from history.

The uncertainty in the historical record should lead us, for purposes of the present inquiry, to give the constitutional right to a jury trial the benefit of the doubt. Indeed, it is difficult to do otherwise after the Court's decision in *Schoenthal* v. *Irving Trust Co.*, 287 U. S. 92 (1932). *Schoenthal* turned on the legal nature of the preference claim and of the relief sought, *id.*, at 94–95, rather than upon the legal nature of the tribunal to which "plenary proceedings" were assigned under the 1898 Bankruptcy Act.

"With the historical evidence thus in equipoise," *ante*, at 87 (WHITE, J., dissenting), but with *Schoenthal* weighing on the "legal" side of the scale, I then would turn to the second stage of the *Atlas Roofing* inquiry: I would ask whether, assuming the claim here is of a "legal" nature, Congress has assigned it to be adjudicated in a special tribunal "with which the jury would be incompatible." *Atlas Roofing*, 430 U. S., at 450; see also *Tull* v. *United States*, 481 U. S. 412, 418, n. 4 (1987). Here, I agree with JUSTICE WHITE that *Katchen* v. *Landy*, 382 U. S. 323 (1966), as interpreted in *Atlas Roofing*, requires the conclusion that courts exercising core bankruptcy functions are equitable tribunals, in which "a jury would be out of place and would go far to dismantle the statutory scheme." *Atlas Roofing*, 430 U. S., at 454, n. 11.

Having identified the tribunal to which Congress has assigned respondent's fraudulent conveyance claim as equitable in nature, the question remains whether the assignment is one Congress may constitutionally make. Under *Atlas Roofing*, that question turns on whether the claim involves a "public right." *Id.*, at 455. When Congress was faced with the task of divining the import of our fragmented decision in *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50 (1982), it gambled and predicted that a statutory right which is an integral part of a pervasive regulatory

scheme may qualify as a "public right." Compare H. R. Rep. No. 98–9, pt. 1, pp. 6, 13 (1983) (House Report), with S. Rep. No. 98–55, pp. 32–40 (1983) (Senate Report); see *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568, 586, 594 (1985); see also *id.*, at 599 (BRENNAN, J., concurring in judgment) ("[A] bankruptcy adjudication, though technically a dispute among private parties, may well be properly characterized as a matter of public rights"). Doing its best to observe the constraints of *Northern Pipeline* while at the same time preserving as much as it could of the policy goals of the major program of bankruptcy reform the decision in *Northern Pipeline* dismantled, see House Report, at 7, Senate Report, at 6–7, Congress struck a compromise. It identified those proceedings which it viewed as integral to the bankruptcy scheme as "core" (doing its best to exclude "*Marathon*-type State law cases"), and assigned them to a specialized equitable tribunal. *Id.*, at 2.

I agree with JUSTICE WHITE, *ante*, at 88–89, that it would be improper for this Court to employ, in its Seventh Amendment analysis, a century-old conception of what is and is not central to the bankruptcy process, a conception that Congress has expressly rejected. To do so would, among other vices, trivialize the efforts Congress has engaged in for more than a decade to bring the bankruptcy system into the modern era.

There are, nonetheless, some limits to what Congress constitutionally may designate as a "core proceeding," if the designation has an impact on constitutional rights. Congress, for example, could not designate as "core bankruptcy proceedings" state-law contract actions brought by debtors against third parties. Otherwise, *Northern Pipeline* would be rendered a nullity. In this case, however, Congress has not exceeded these limits.

Although causes of action to recover fraudulent conveyances exist outside the federal bankruptcy laws, the problems created by fraudulent conveyances are of particular sig-

nificance to the bankruptcy process. Indeed, for this reason, the Bankruptcy Code long has included substantive legislation regarding fraudulent conveyances and preferences. And the cause of action respondent brought in this case arises under federal law. See 11 U. S. C. §§ 548(a)(2) and 550(a). This substantive legislation is not a jurisdictional artifice. It reflects, instead, Congress' longstanding view that fraudulent conveyances and preferences on the eve of bankruptcy are common methods through which debtors and creditors act to undermine one of the central goals of the bankruptcy process: the fair distribution of assets among creditors. Congress' conclusion that the proper functioning of the bankruptcy system requires that expert judges handle these claims, and that the claims be given higher priority than they would receive on a crowded district court's civil jury docket (see Senate Report, at 3; House Report, at 7–8), is entitled to our respect.

The fact that the reorganization plan in this case provided that the creditor's representatives would bring fraudulent conveyance actions only after the plan was approved does not render the relationship between fraudulent conveyance actions and the bankruptcy process "adventitious." *Ante,* at 60, n. 15 (majority opinion). Creditors would be less likely to approve a plan which forced them to undertake the burden of collecting fraudulently transferred assets if they were not assured that their claims would receive expert and expedited treatment.

In sum, it must be acknowledged that Congress has legislated treacherously close to the constitutional line by denying a jury trial in a fraudulent conveyance action in which the defendant has no claim against the estate. Nonetheless, given the significant federal interests involved, and the importance of permitting Congress at long last to fashion a modern bankruptcy system which places the basic rudiments of the bankruptcy process in the hands of an expert equitable tribunal, I cannot say that Congress has crossed the constitutional line on the facts of this case. By holding otherwise, the Court

today throws Congress into still another round of bankruptcy court reform, without compelling reason. There was no need for us to rock the boat in this case. Accordingly, I dissent.