**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 94-50507

In re Raymond Clay and Scott Clay, d/b/a The Emporium,

Petitioners.

On Petition for Writ of Mandamus to the
United States District Court for the Western District of Texas

(October 3, 1994)

Before HIGGINBOTHAM, SMITH, and STEWART, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Raymond and Scott Clay want a jury trial, but not in bankruptcy court. The Clays seek a writ of mandamus to prevent the bankruptcy court from conducting a jury trial in various core proceedings. The argument is that Congress cannot constitutionally empower non-Article III bankruptcy judges to hold jury trials without the parties' consent. Because the applicable statute may fairly be read as not granting such authority, we say only that such a congressional effort would be dubious at best.

The trustee for the bankruptcy estate of Heelco Corporation filed a complaint in the U.S. Bankruptcy Court for the Western District of Texas. The complaint sought turnover and avoidance of

preferential and fraudulent transfers and post-petition transactions with petitioners, the Clays. The Clays filed jury demands in the bankruptcy court. In the district court, the Clays filed a motion to withdraw the reference of the case from the bankruptcy court.

The bankruptcy court found that the Clays had a Seventh Amendment right to a jury trial and that the claims involved were core proceedings. The court also held that it had the authority to conduct a jury trial and had no authority to decline a reference from the district court.

On June 28, 1994, the district court entered an order denying the Clays' motion to withdraw the reference from the bankruptcy court. It concluded that bankruptcy judges have the power to preside over jury trials in core proceedings. The Clays then filed this petition for writ of mandamus.

The parties do not dispute the core nature of the proceedings or the Clays' right to a jury trial. Nor do they contest the propriety of review via petition for writ of mandamus. Cf. La Buy v. Howes Leather Co., 352 U.S. 249 (1957) (upholding use of mandamus to vacate referral of cases to special master). The sole issue presented is whether the bankruptcy judge has the constitutional and statutory authority to conduct the jury trial without the consent of the parties. Because the constitutional question influences the interpretation of the statute, we first address the Constitution.

I.

A.

The American colonists suffered greatly under judges controlled by King George III. They listed this grievance in the Declaration of Independence: "He has made Judges dependent on his Will alone, for the Tenure of their Offices, and the Amount and Payment of their Salaries." Declaration of Independence para. 11 (U.S. 1776). The Framers made judicial independence a cornerstone of our judicial system. The Federalist Papers stressed the need for lifetime tenure and salary protection for judges. "Periodical appointments, however regulated, or by whomsoever made, would, in some way or other, be fatal to [the courts'] necessary independence." The Federalist No. 78, at 471 (Alexander Hamilton) (Clinton Rossiter ed., 1961). "Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support. . . . In the general course of human nature, a power over a man's subsistence amounts to a power over his will." The Federalist No. 79, at 472 (Alexander Hamilton).

The Framers guarded against this danger in Article III of the Constitution:

> The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

U.S. Const. art. III, § 1. In other words, only judges who enjoy

life tenure and protection against salary cuts can exercise "[t]he judicial Power of the United States." Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 59 (1982) (Brennan, J., plurality opinion).

These guarantees insure independence from legislative and executive influence, promote public confidence in judicial integrity, attract well qualified jurists to the bench, and insulate judges from pressure by other judges. Id. at 57-60 & n. 10; The Federalist No. 78 (Alexander Hamilton). Courts and commentators focus on the importance of insulating judges from Congress and the Executive Branch. But as Chief Judge Kaufman noted, "it is equally essential to protect the independence of the individual judge, even from incursions by other judges. The heart of judicial independence, it must be understood, is judicial individualism," and giving one judge power over another chills judicial individualism. Irving R. Kaufman, Chilling Judicial Independence, 88 Yale L.J. 681, 713 (1979). A judge must be free to decide a case according to the law as he sees it, without fear of personal repercussion or retaliation from any source.

Despite the absolute language of Article III, the Supreme Court has carved out three exceptions for so-called Article I legislative courts, which need not enjoy life tenure or salary protection. First, Congress may create legislative courts for U.S. territories and the District of Columbia, because Articles I and IV of the Constitution give Congress plenary power over these geographic enclaves. Marathon, 458 U.S. at 64-65 (Brennan, J.,

4

plurality opinion); <u>Palmore v. United States</u>, 411 U.S. 389, 407 (1973) (District of Columbia); <u>American Ins. Co. v. Canter</u>, 26 U.S. (1 Pet.) 511, 546 (1828) (territories). Second, courts-martial need not conform to Article III's requirements, because Congress and the Commander-in-Chief have extraordinary leeway in military affairs. <u>Marathon</u>, 458 U.S. at 66 (Brennan, J., plurality opinion); <u>Dynes v. Hoover</u>, 61 U.S. (20 How.) 65, 79 (1857). Third, Article I courts may hear cases involving "public rights," which are rights against the government or closely intertwined with a regulatory scheme. <u>Thomas v. Union Carbide Agric. Prods.</u>, 473 U.S. 568, 593-94 (1985); <u>Marathon</u>, 458 U.S. at 67-70 (Brennan, J., plurality opinion). The rationale underlying the public rights exception is that because "Congress [was] free to commit such matters completely to nonjudicial executive determination, . . . there can be no constitutional objection to Congress' employing the less drastic expedient of committing their determination to a legislative court or an administrative agency." <u>Marathon</u>, 458 U.S. at 68 (Brennan, J., plurality opinion) (citing <u>Crowell v. Benson</u>, 285 U.S. 22, 50 (1932)); <u>see also</u> <u>Murray's Lessee v. Hoboken Land & Improvement Co.</u>, 59 U.S. (18 How.) 272, 284 (1855).

Regardless of whether a case involves territories, the military, or public rights, an Article III court may employ non-Article III adjuncts, such as special masters and magistrates. The only limitation is that the Article III court must retain "'the essential attributes of the judicial power.'" <u>Marathon</u>, 458 U.S. at 77-81 (Brennan, J., plurality opinion) (quoting <u>Crowell</u>, 285

5

U.S. at 51).

In Marathon, the Supreme Court struck down the scheme of bankruptcy courts set up by the Bankruptcy Act of 1978. Bankruptcy courts had the power to preside over jury trials, issue declaratory judgments, issue writs of habeas corpus, and issue orders, process, and judgments. Their judgments were reviewable under the clearly erroneous standard. The plurality relied upon these facts in concluding that district courts had not retained "the essential attributes of the judicial power." Id. at 87 (internal quotation marks omitted). The plurality also concluded that the courts were not public rights courts because they handled noncore proceedings between private parties. Id. at 71. The concurring Justices agreed that the bankruptcy courts were not adjuncts because of the deferential standard of review. Id. at 91 (Rehnquist, J., concurring in the judgment). They noted that the exercise of jurisdiction did not involve public rights, because English common-law courts heard such claims in the eighteenth century. "No method of adjudication is hinted, other than the traditional common-law mode of judge and jury." Id. at 90.

In the wake of Marathon, Congress passed the Bankruptcy Amendments and Federal Judgeship Act of 1984 (BAFJA). Pub. L. No. 98-353, 98 Stat. 333 (codified as amended in scattered sections of U.S.C. titles 5, 11, and 28). Even after BAFJA, bankruptcy courts do not satisfy the requirements of Article III: they serve fourteen-year terms, are removable for cause, and enjoy no protection from salary cuts. See 28 U.S.C. § 152(a)(1), (e).

6

Marathon suggested that core proceedings "may well be" cases involving public rights, and BAFJA responded to Article III concerns by restricting bankruptcy courts to core proceedings. 28 U.S.C. § 157(b); Marathon, 458 U.S. at 71 (Brennan, J., plurality opinion). Congress also styled bankruptcy courts as adjuncts, labeling them "a unit of the district court." 28 U.S.C. § 151.

B.

An Article III court may not delegate "'the essential attributes of the judicial power'" to an adjunct. Marathon, 458 U.S. at 77 (Brennan, J., plurality opinion) (quoting Crowell, 285 U.S. at 51). The authority to conduct a jury trial is an essential attribute. In noting that bankruptcy courts have all of the usual powers of district courts, the very first power listed by the Marathon plurality was the authority to conduct jury trials. Id. at 85. In Schor, the Court distinguished Marathon on this ground, upholding the CFTC's authority because the CFTC cannot hold jury trials or issue writs of habeas corpus. CFTC v. Schor, 478 U.S. 833, 853 (1986). Cf. Gomez v. United States, 490 U.S. 858 (1989) (construing statute as forbidding magistrates to conduct nonconsensual voir dire, to avoid serious constitutional questions under Article III); United States v. Ford, 824 F.2d 1430, 1435 (5th Cir. 1987) (en banc) (same), cert. denied, 484 U.S. 1034 (1988).

Jury trials are at the heart of "the judicial Power," as shown by the Framers' focus on juries. Article III itself guarantees criminal jury trials. Because colonial Americans considered this

7

protection inadequate, they insisted on a Bill of Rights to cure the deficiency. As a result, the Fifth, Sixth, and Seventh Amendments enshrine the right to criminal grand juries and criminal and civil petit juries. Americans considered juries vital to the judiciary because juries check government overreaching, educate the citizens who serve on them, keep justice local, and permit popular participation in the administration of justice. Akhil R. Amar, The Bill of Rights as a Constitution, 100 Yale L.J. 1131, 1183-89 (1991) (collecting historical sources); Richard S. Arnold, Trial by Jury: The Constitutional Right to a Jury of Twelve in Civil Trials, 22 Hofstra L. Rev. 1, 15-17 (1993). For example, one colonial theorist endorsed juries as "the 'lower judicial bench' in a bicameral judiciary"; another described them as "'the democratic branch of the judiciary power.'" Amar, supra, at 1189 (quoting John Taylor of Caroline and the "Maryland Farmer") (emphasis omitted). In short, the Framers viewed jury trials as an essential part of judicial power.

The inadequacy of district court review of jury trials is fatal to delegation to adjuncts. In upholding a magistrate's power to rule on a pretrial motion, the Court stressed the importance of de novo review in maintaining sufficient Article III control over an adjunct. United States v. Raddatz, 447 U.S. 667, 681-82 (1980); see also Gomez, 490 U.S. at 875 n.29 (suggesting that Raddatz requires that district court be able to rehear witnesses and decide for itself de novo). Marathon likewise emphasized the need for ample review of an adjunct by an Article III court. 458 U.S. at 85

8

(Brennan, J., plurality opinion) (disapproving of clearly erroneous standard of review of bankruptcy court judgments); id. at 91 (Rehnquist, J., concurring in the judgment) (holding that bankruptcy courts were not adjuncts because they were subject "only [to] traditional appellate review").

De novo review is inconsistent with the Seventh Amendment, which states: "[N]o fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."  In other words, the Seventh Amendment permits only ordinary appellate review; but Marathon held that ordinary appellate review did not satisfy Article III.  This court has recognized the clash between Article III review of adjunct proceedings and Seventh Amendment sanctity of jury verdicts: "The reference [to a magistrate for jury trial] either effectively denies the right to trial by jury, or impermissibly abrogates the decisive role of the district judge, or both."  Ford v. Estelle, 740 F.2d 374, 380 (5th Cir. 1984).

De novo review by a district court is also impossible in practice, because a cold record cannot capture the atmosphere, the expressions, the attitudes that are the marrow of a jury trial.  Gomez, 490 U.S. at 874-75; United States v. Ford, 824 F.2d at 1435-36; see also Geras v. Lafayette Display Fixtures, Inc., 742 F.2d 1037, 1049 (7th Cir. 1984) (Posner, J., dissenting) (noting that appellate review leaves trial judge wide latitude in evidentiary rulings, instructions, and comments).  Only verbal acrobatics could label the autonomous conduct of a trial as adjunct to anything.

9

C.

There is an argument that while Congress treated bankruptcy courts as adjuncts of district courts, they are defensible as legislative courts hearing public rights cases, based on Marathon's statement that core proceedings in bankruptcy "may well be a 'public right,' but [a noncore proceeding] obviously is not." 458 U.S. at 71 (Brennan, J., plurality opinion). There is a related argument that core bankruptcy proceedings are closely linked to the bankruptcy regulatory scheme and qualify as public rights cases for that reason. See Union Carbide, 473 U.S. at 594. We do not see bankruptcy law as a "public regulatory scheme" akin to the Federal Insecticide, Fungicide, and Rodenticide Act discussed in Union Carbide. It provides process, procedures, and a forum, but does not (as would a public regulatory scheme) implement policy choices beyond the confines of cases brought to it. Resolving disputes over compensation was part of the comprehensive administrative regime of FIFRA.

The public rights/private rights dichotomy of Crowell and Murray's Lessee is a deceptively weak decisional tool. Regardless, it is unpersuasive here. The plurality in Marathon spoke tentatively because its remarks were dicta; the facts in Marathon involved a noncore proceeding based on a state-law contract claim. Moreover, the reasoning of the concurring Justices in Marathon applies to any case involving a right to a jury trial. They held that Marathon was not a public rights case because it was "the stuff of the traditional actions at common law tried by the courts

10

at Westminster in 1789. . . . No method of adjudication is hinted, other than the traditional common-law mode of judge and jury." 458 U.S. at 90 (Rehnquist, J., concurring in the judgment). Regardless of whether one characterizes a proceeding as core or noncore, a case is not a public rights case if a litigant has a Seventh Amendment right to trial by jury.

The Court's readings of the Seventh Amendment confirm this reasoning. The test for whether an Article III court is necessary for an action at law is the same as the test for whether a party has a Seventh Amendment right to a jury trial. Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 53 (1989). Thus, in a suit that would have been tried at common law in England in 1789, a litigant has both a Seventh Amendment right to a jury and an Article III right to an Article III court.

We may sometimes fail to acknowledge the equitable roots of certain bankruptcy cases and hence find a right to a jury trial when we should not. Bankruptcy jurisdiction, which is largely equitable, is nigh mutually exclusive of cases or controversies at law in which there is a right to trial by jury. Congress, the Executive Branch, and the courts may choose to resolve legislative, executive, or equitable judicial disputes by using a "jury" even though the Seventh Amendment does not require it. When a non-Article III court uses such an optional "jury," not only does the Seventh Amendment not forbid de novo review of the "jury's" findings, see Capital Traction Co. v. Hof, 174 U.S. 1, 38-39 (1899), but the need for supervision by an Article III court may

11

necessitate de novo review.  But cf. Peretz v. United States, 501 U.S. 923, 939 (1991) (treating Article III right to de novo review as waivable).  Optional "juries" in non-Article III courts are in effect advisory juries for Article III courts.  But where a case or controversy gives rise to a Seventh Amendment right to a jury trial, Congress may not give jurisdiction to a non-Article III court.

This conclusion jibes with the reasons underlying the public rights exception.  Marathon explained the rationale: because "Congress [is] free to commit [public rights cases] completely to nonjudicial executive determination, [it can] employ[] the less drastic expedient of committing their determination to a legislative court or an administrative agency."  458 U.S. at 68 (Brennan, J., plurality opinion) (citing Crowell, 285 U.S. at 50); accord Ex parte Bakelite Corp., 279 U.S. 438, 458 (1929); Murray's Lessee, 59 U.S. at 284; see Union Carbide, 473 U.S. at 589.  But where the Seventh Amendment applies, Congress is not free to commit the case "completely to nonjudicial executive determination." Because the litigant has a right to a judicial proceeding including a jury trial, the public rights doctrine cannot apply.


                              D.

The trustee makes two counterarguments.  First, he claims that policy considerations such as efficiency support the authority of bankruptcy courts to hold jury trials.  Shifting jury trials to district courts, he reasons, would interrupt ongoing proceedings

12

and split proceedings between bankruptcy and district courts. The trustee argues that moving jury trials to district courts would inundate district courts with core matters in which they lack expertise. Furthermore, he says, giving litigants the power to switch courts by demanding jury trials would produce forum-shopping and delay, as defendants would take advantage of district courts' crowded dockets to slow cases down. See In re Grabill, 967 F.2d 1152, 1159-60 (7th Cir. 1992) (Posner, J., dissenting); Smith v. Lynco-Elec. Co. (In re El Paso Refinery, L.P.), 165 B.R. 826, 831 & n.6 (W.D. Tex. 1994). The district court in this case endorsed El Paso's "practical opinion," suggesting that it too relied on these policy arguments.

The trustee would trumpet efficiency, but we hear a kazoo, at best. Reports of strategic manipulation of jury trials have been greatly exaggerated. In practice, litigants have not begun demanding more jury trials since 1989, when Granfinanciera established a right to jury trial in certain bankruptcy proceedings. Grabill, 967 F.2d at 1157-58; Steinberg v. Mellon Bank (In re Grabill Corp.), 132 B.R. 725, 727 n.3 (N.D. Ill. 1991); cf. Granfinanciera, 492 U.S. at 63 n.17 (finding that similar concerns with jury trials in fraudulent conveyance actions had been overstated). A district court could avert split proceedings by withdrawing the reference to the bankruptcy court.

If anything, jury trials in bankruptcy courts would impede efficiency. These speedy courts were not designed to conduct long jury trials, and most bankruptcy judges and lawyers are unused to

13

jury procedures.  Grabill, 967 F.2d at 1158; Ellenberg v. Bouldin, 125 B.R. 851, 854 (N.D. Ga. 1991); Weeks v. Kramer (In re G. Weeks Securities, Inc.), 89 B.R. 697, 710 (Bankr. W.D. Tenn. 1988).  In this respect, district courts have far more expertise than bankruptcy courts do.

Regardless, "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution."  INS v. Chadha, 462 U.S. 919, 944 (1983).  The Framers separated power as a prophylaxis against its abuse.  They chose to sacrifice a measure of efficiency and expediency to insure that judges would be independent of the President, Congress, and other judges.  See The Federalist No. 79, at 474 (Alexander Hamilton) (rejecting provision for removal of mentally disabled judges because that power might be abused).  We are not free to tinker with this carefully crafted choice.

The trustee's second argument is that other non-Article III federal courts have the authority to conduct jury trials.  For example, local District of Columbia courts can conduct jury trials. Pernell v. Southall Realty, 416 U.S. 363 (1974) (not discussing Article III issue).  In addition, federal magistrates can conduct jury trials with the parties' consent.  28 U.S.C. § 636(c)(1); Collins v. Foreman, 729 F.2d 108 (2d Cir.), cert. denied, 469 U.S. 870 (1984).

This is true, but consent matters.  Because one function of Article III is to protect litigants, courts have accorded

14

significant if not dispositive weight to consent and waiver. In doing so, these courts may have undervalued the structural component of Article III--the idea that the location of dispute resolution is not solely the concern of the litigants in given cases. Schor, 478 U.S. at 848-51 (upholding CFTC's jurisdiction and distinguishing Marathon because Schor consented while Marathon had not); Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc., 725 F.2d 537, 541-44 (9th Cir.) (en banc) (Kennedy, J.) (upholding magistrate's power to hold bench trial because litigants consented), cert. denied, 469 U.S. 824 (1984). However, a litigant may waive his Seventh Amendment right to jury trial. Bank of Columbia v. Okely, 17 U.S. (4 Wheat.) 235, 244 (1819). Likewise, a litigant may choose to submit his case to a magistrate, arbitrator, or other non-Article III tribunal. A litigant may even choose to settle or not to bring suit at all. Consent is a key factor empowering magistrates to conduct jury proceedings. Compare Gomez, 490 U.S. at 870 (construing statute as not permitting federal magistrate to conduct nonconsensual voir dire, to avoid serious constitutional question, and noting that "[a] critical limitation on [magistrates'] expanded jurisdiction is consent") with Peretz, 501 U.S. at 932 (allowing consensual voir dire by magistrate and distinguishing Gomez because "the defendant's consent significantly changes the constitutional analysis"). Thus, the magistrate analogy is weak.

The comparison to territorial courts is stronger but still inapposite. In Marathon, the Supreme Court distinguished

15

territorial courts from bankruptcy courts. The plurality reasoned that the District of Columbia is "a unique federal enclave over which Congress has . . . entire control"; it can exercise such power "only in limited geographic areas." 458 U.S. at 75-76 (Brennan, J., plurality opinion) (internal quotation marks omitted). The Court refused to expand this narrow, historic category to authorize similar powers for bankruptcy courts. So do we.

## II.

We need not and should not rest on these constitutional grounds. A court must not interpret a statute in a way that raises constitutional questions if a reasonable alternative construction poses no such problems. Gomez, 490 U.S. at 864; Crowell, 285 U.S. at 62; NLRB v. Catholic Bishop, 440 U.S. 490, 507 (1979) (declining to reach constitutional question in absence of clear statement of congressional intent). Unless BAFJA contains a clear statement empowering bankruptcy judges to conduct jury trials, we must construe the statute as not granting that power. This interpretative principle of restraint is important, but can perversely expand the bite of constitutional rules so carefully not invoked. We are careful to take a hard look at the constitutional issues avoided--to insure that we not flee rabbits. This said, the constitutional concerns here are concrete and large.

Six circuits have considered this issue, and five have decided that bankruptcy courts lack the statutory authority to conduct jury

16

trials. Official Committee v. Schwartzman (In re Stansbury Poplar Place, Inc.), 13 F.3d 122, 127-28 (4th Cir. 1993) (construing BAFJA as not empowering bankruptcy judges to hold jury trials, to avoid constitutional issue); In re United Missouri Bank, N.A., 901 F.2d 1449, 1456-57 (8th Cir. 1990) (same); Grabill, 967 F.2d at 1153-55 (same); Rafoth v. National Union Fire Ins. Co. (In re Baker & Getty Financial Servs., Inc.), 954 F.2d 1169, 1173 (6th Cir. 1992) (resting only on statutory argument); Kaiser Steel Corp. v. Frates (In re Kaiser Steel Corp.), 911 F.2d 380, 391-92 (10th Cir. 1990) (same). Contra Ben Cooper, Inc. v. Insurance Co. (In re Ben Cooper, Inc.), 896 F.2d 1394 (2d Cir.), cert. granted, 497 U.S. 1023, vacated and remanded, 498 U.S. 964 (1990), previous op. reinstated, 924 F.2d 36 (2d Cir.), and cert. denied, 500 U.S. 928 (1991).

We agree with the Fourth, Sixth, Seventh, Eighth, and Tenth Circuits. The statute need not be read as attempting a run at this mountain. Indeed, BAFJA is silent on the subject. Only one section mentions juries, stating: "[T]his chapter and title 11 do not affect any right to trial by jury . . . [for] a personal injury or wrongful death tort claim," except that a district court may order a bench trial for issues under 11 U.S.C. § 303. 28 U.S.C. § 1411. As the Second Circuit has noted, § 1411 "offers almost no guidance." Ben Cooper, 896 F.2d at 1402; accord Granfinanciera, 492 U.S. at 40 n.3 (finding § 1411 to be "notoriously ambiguous").

Section 157(b) offers little light. It requires that either the district court in the district where the claim arose or the

17

district court in which the bankruptcy case is pending try personal injury and wrongful death claims.  28 U.S.C. § 157(b)(5).  Some courts reason that because sections 157(b) and 1411 single out personal injury and wrongful death cases for jury trials in district courts, bankruptcy courts may hold all other jury trials. Perino v. Cohen (In re Cohen), 107 B.R. 453, 455 (S.D.N.Y. 1989); Wolfe v. First Fed. Sav. & Loan Ass'n (In re Wolfe), 68 B.R. 80, 87-88 (Bankr. N.D. Tex.), appeal denied sub nom. M & E Contractors, Inc. v. Kugler-Morris Gen. Contractors, Inc., 67 B.R. 260 (N.D. Tex. 1986).  Others read § 1411's express preservation of a right to jury trial in personal injury cases as implying that Congress did not foresee jury trials in other types of cases.  E.g., Grabill, 967 F.2d at 1153.  Both readings are reasonable; neither is compelling.  In short, sections 157(b) and 1411 are ambiguous.

The same is true of the more general provisions of BAFJA. Section 151 provides: "Each bankruptcy judge, as a judicial officer of the district court, may exercise the authority conferred under this chapter with respect to any action, suit, or proceeding and may preside alone and hold a regular or special session of the court . . . ."  28 U.S.C. § 151.  Section 157(b)(1) states: "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11 . . . and may enter appropriate orders and judgments . . . ."  28 U.S.C. § 157(b)(1). The trustee argues that this language empowers bankruptcy judges in strong and unqualified terms, drawing no distinction between bench and jury trials.  Other courts, however, have read these sections

18

as personally empowering bankruptcy judges to "hear and determine all cases," rather than empowering them to delegate fact-finding to juries. Grabill, 967 F.2d at 1155; Kaiser, 911 F.2d at 391. Kaiser also noted that Congress repealed § 1481, which had given bankruptcy judges "'the powers of a court of equity, law and admiralty.'" Id. (quoting 28 U.S.C. § 1481 (repealed)). Neither § 151 nor § 157(b)(1) says anything about juries and procedures.

The trustee's final argument notes that the Emergency Rules adopted in the wake of Marathon prohibited bankruptcy judges from holding jury trials, but BAFJA was silent on the issue. One could read this silence as either perpetuating or repudiating the ban on jury trials in bankruptcy court. Grabill, 967 F.2d at 1154. This argument is too weak to be of much help.

Congress passed BAFJA in 1984, before Granfinanciera recognized the Seventh Amendment rights of litigants in bankruptcy cases. As the Supreme Court has noted, BAFJA's "denial of the right to a jury trial in preference and fraudulent conveyance actions can hardly be said to represent Congress' considered judgment of the constitutionality of this change." Granfinanciera, 492 U.S. at 61 n.16. Since Congress did not consider whether it could deny jury trials, it would be difficult to conclude that it considered a bankruptcy court's power to preside over jury trials. United Missouri Bank, 901 F.2d at 1456; see Kaiser Steel, 911 F.2d at 392.

The statute contains no clear statement proscribing or prescribing jury trials in bankruptcy court. We are not persuaded

19

that Congress would have challenged such formidable constitutional principles by innuendo.  We GRANT the writ of mandamus and instruct the district court to withdraw the reference to the bankruptcy court and honor the Clays' demand for trial by jury before an appropriate United States District Court.

WRIT GRANTED.